**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| IN RE: | ) | Misc. No.: |
| | ) | |
| BESTWALL, LLC, | ) | Underlying Case No. 17-BK-31795 (LTB) |
| | ) | (U.S. Bankruptcy Court for the Western |
| Debtor. | ) | District of North Carolina) |

**MOTION OF THIRD PARTY ASBESTOS TRUSTS TO**
**QUASH OR MODIFY SUBPOENAS**

Pursuant to Federal Rule of Civil Procedure 45(d)(3)(A)(iii), the nine asbestos settlement trusts identified below[1] (the "Trusts"), by and through their undersigned counsel, respectfully move the Court to enter an order quashing or modifying the subpoenas to produce electronically stored claimant information which have been served upon them and the Delaware Claims Processing Facility (the "DCPF") by Bestwall LLC (the "Motion").[2]  In support of the Motion, the Trusts state as follows:

**INTRODUCTION**

1.     Each of the Trusts was established by one or more corporate debtors-in-possession to assume those debtors' present and future liability for asbestos-related personal injury claims, as

---

[1] The nine Trusts include:
- The Armstrong World Industries, Inc. Asbestos Personal Injury Settlement Trust;
- The Celotex Asbestos Settlement Trust;
- The Flintkote Asbestos Trust;
- The Pittsburgh Corning Corporation Personal Injury Settlement Trust;
- The WRG Asbestos PI Trust;
- The Federal-Mogul Asbestos Personal Injury Trust;
- The Babcock & Wilcox Company Asbestos PI Trust;
- The United States Gypsum Asbestos Personal Injury Settlement Trust; and
- The Owens Corning / Fibreboard Asbestos Personal Injury Trust.

[2] Following the filling of the instant Motion and assignment of a miscellaneous matter number, DII Industries, LLC Asbestos PI Trust, which is represented by the same undersigned counsel, intends to move to join the Motion insofar it seeks to quash or modify the subpoena served on the DCPF.

a prerequisite to having a United States District Court issue an asbestos claims channeling injunction pursuant to 11 U.S.C. §524(g) to supplement the terms of the confirmation order in the debtor's bankruptcy case.  The Trusts are not corporate defendants or insurance companies.  They are limited funds whose sole purpose is to pay victims of asbestos-related diseases caused by the products of the debtors.

2.      The Trust Agreements establishing each of the Trusts require that the Trustees administer, maintain, and operate the Trusts pursuant to certain written Trust Distribution Procedures (the "TDP"), provisions of which – both the Trust Agreement and the TDP – were approved by a United States District Court and thereby incorporated into the debtor's confirmed plan and the Court's order confirming the plan.[3]

3.      Each TDP expressly provides that submissions to the Trust by the holders of the channeled asbestos claims (the "Trust Claimants") (i) are intended to be confidential, (ii) will be treated as made in the course of settlement discussions between the claimant and the Trust, and (iii) are to be protected by all applicable privileges, including those applicable to settlement discussions.  *See*, *e.g.*, Ex. A (Federal-Mogul Asbestos Injury Trust Distribution Procedures), § 6.5.  Further, the TDPs of eight of the Trusts provide that the Trust shall "on its own initiative" take steps to preserve such privileges.  *Id.*[4]

---

[3]  Each of the bankruptcy cases was conducted in the United States Bankruptcy Court for the District of Delaware, other than that of Pittsburgh Corning Corporation, which was conducted in the United States Bankruptcy Court for the Western District of Pennsylvania, and that of the Celotex Corporation, which was conducted in the United States Bankruptcy Court for the Middle District of Florida.

[4]  The Celotex Asbestos Settlement Trust's procedures are older in form and are called Claims Resolution Procedures.  While they do not contain precisely the same language, they do state that "[a]ll materials, records and information submitted by claimants … are confidential, submitted solely for settlement purposes."

4.      The predicate for this Motion is the confidentiality provisions of the Trusts' TDPs. These provisions make clear that the Trusts are not to serve as information clearinghouses or "public libraries" for entities that wish to obtain confidential claimant information for their own commercial purposes.  Rather, each Trust should take reasonable and necessary steps to protect the confidentiality of the information submitted to it by the Trust Claimants when that information is sought by third parties for purposes other than determining whether the claims submitted to the Trust in question are valid and payable.

5.      The most pressing issue presented by this Motion is not the undue burden of the requested production (although the Trusts do not waive that objection), but the undue risk of damages the requested scale and manner of the production imposes on the Trust Claimants, relating to a possible data breach with regard to their social security numbers and other personal confidential information.

## BACKGROUND

6.      On April 5, 2021, Bestwall LLC served a subpoena issued by the United States Bankruptcy Court for the Western District of North Carolina on each of the Trusts, c/o the Delaware Claims Processing Facility (the "DCPF") in Wilmington, Delaware.  *See generally* Ex. B (aggregated subpoenas for the Trusts and DCPF).  The subpoenas compel the production of electronically stored confidential information submitted to the Trusts by more than 15,000 of the Trust Claimants.

7.      Bestwall also served a subpoena for the Trust Claimants' data on the DCPF on April 5, 2021.  *Id.* at 48-50.  The Trusts have contracted with the DCPF to process the Trust Claimants' claims according to the criteria and protocols of each Trust's TDP.  As such, the DCPF holds the Trusts' data related to the claims made by the Trust Claimants.  Although the DCPF

holds the data of the Trusts, because of confidentiality requirements, the Trusts do not have access to each other's data through the DCPF or otherwise.

8.     Bestwall is the debtor in a pending chapter 11 bankruptcy case in the Western District of North Carolina, Case No. 17-BK-31795 (LTB).  It seeks evidence to support its contention that the Bankruptcy Court should adopt a low estimation of the total value of its liability for present and future asbestos personal injury claims.

9.     Bestwall endeavors to show that the evidentiary value of the amount it paid to settle approximately 15,000 pre-bankruptcy mesothelioma claims is tainted because a significant percentage of the roughly 15,000 claimants withheld information about other alleged asbestos exposure, which resulted in Bestwall overpaying for its share of such claimants' damages.  Ex. C (Rule 2004 Motion), ¶¶2, 12.

10.     Accordingly, on July 31, 2020, Bestwall moved under Bankruptcy Rule 2004 (the "2004 Motion") for authority to issue a subpoena on the DCPF for the production of electronically stored data concerning any of Bestwall's roughly 15,000 settled mesothelioma claimants who also filed a claim against one or more of the Trusts.[5]  *Id.* at 3-4.  Bestwall served the 2004 Motion on the DCPF, but not on any of the Trusts.

11.     Thereafter, the DCPF filed a Response and Objection to the 2004 Motion, asserting, among other things, that (i) there is inherently sensitive information in its databases that relate to Trust Claimants; (ii) the databases include personal identifiers and medical information; and (iii) the improper dissemination of such information could harm the Trust Claimants in a variety of

---

[5]  Bestwall also sought authority to issue subpoenas on the Trusts, in the event the DCPF was to assert that such are necessary to secure production.

ways, ranging from identity theft to misuse in the tort system by other defendants.  Ex. D (DCPF Response and Objection), 16-23.

12.     The DCPF's Response and Objection requested that the Court deny the 2004 Motion.  It also alternatively requested that, if the Court granted the 2004 Motion, the Court enter an order with a number of confidentiality protections and use limitations, including:

a.     Limiting the production of Trust Claimants' data to a random sample of no more than 10% of the 15,000 mesothelioma victims at issue; and

b.     Authorizing the DCPF, or a neutral third party, to anonymize the Trust Claimants' claims data before producing it or, at minimum, requiring Bestwall and its experts to anonymize such data after it is produced, and barring Bestwall from re-associating claimant personally identifiable information with the anonymized data.

*Id.* at 35-36.  The DCPF's request was consistent with its duty under its Claims Processing Agreement with the Trusts to use its best efforts – when required to disclose confidential information – to ensure that such information will be treated as confidential by all who receive it.

13.     On March 4, 2021, the Bankruptcy Court conducted a hearing during which the Judge concluded that Bestwall had met its burden of showing that the information sought is both relevant and necessary to the bankruptcy case, and that the 2004 Motion should be granted.  The Bankruptcy Court also stated that it shared the DCPF's concerns about the confidential, proprietary, and inherently sensitive nature of the data that would be collected by Bestwall, and indicated that the 2004 Motion would be granted subject to conditions.  Ex. E (Hearing Transcript), 13:16-14:10.

14.     On March 24, 2021, the Bankruptcy Court entered an order granting the 2004 Motion subject to certain provisions governing confidentiality.[6]  Ex. B, 5-24.  However, the March

---

[6]  The March 24 Order also authorized Bestwall to subpoena the Trusts if necessary to effectuate such order.

24 Order did not limit the protection of data to a random sample of no more than 10% of the 15,000 claims at issue, nor did it authorize a neutral party to anonymize the Trust Claimants' data before production.  Instead, it authorized Bates White, LLC – a firm whose data science practice aggregates and analyzes data for use by its customers, and which acts as Bestwall's liability consultant – to anonymize the Trust Claimants' data.

15.     The March 24 Order further requires the DCPF to identify a subset of matches to last names and social security numbers to Bates White by April 21, 2021.  The DCPF is to provide Bates White with the complete data pertaining to matched claimants by May 28, 2021.

16.     Bestwall intends to have Bates White take the extraordinarily sensitive claims files from the DCPF that relate to up to 15,000 Trusts Claimants, which are separately maintained by the Trusts, and pool them into a single database.

## RELIEF REQUESTED

17.     Pursuant to the Court-approved confidentiality provisions of the TDPs requiring the Trusts to take action to protect Trust Claimants' confidential information, the Trusts respectfully request the Court quash each of the subpoenas served on the Trusts and the DCPF by Bestwall.  Alternatively, the Trusts respectfully request the entry of an order protecting their confidentiality concerns by modifying each of the subpoenas to:

a.     Limit the production of data to a random sample of no more than 10% of the roughly 15,000 mesothelioma victims at issue; and

b.     Require the DCPF to anonymize the Trusts' claims data before producing complete data to Bates White or Bestwall.

## ARGUMENT

18.     Courts have discretion to quash or modify a subpoena under Rule 45.  Rule 45(d)(3)(A) requires the court in which compliance with the subpoena is required to quash or

modify a subpoena which requires disclosure of privileged or other protected matter.[7]  Fed. R. Civ.

Pro. 45(d)(3)(A).  The Court's "discretion should be exercised to avoid the unnecessary disclosure

of confidential material."  *Verisign, Inc. v. XYZ.com, LLC*, 2015 WL 7960976, at *4 (D. Del. Dec.

4, 2015).  A subpoena should be quashed where it constitutes "an overbroad, general request for

unlimited access to [confidential] information."  *Apex Fin. Options, LLC v. Gilbertson*, 2021 WL

965509, at *5 (D. Del. Mar. 15, 2021) (quashing subpoena that was "a fishing expedition for which

Plaintiffs have presented no factual support, only conclusory arguments").

> **A.**  **The Subpoenas Must be Quashed or Modified Because They are Overbroad and Seek Confidential and Sensitive Personal Information For 15,000 Personal Injury Victims, When a Random Sample of 1,500 Would Accomplish Bestwall's Purpose.**

19.     The highly sensitive, personal, and confidential nature of the information sought by

Bestwall, as well as the unnecessary scale of disclosure sought, weigh decisively in favor of

quashing the subpoenas or modifying the sample size to be produced.

20.     Trust Claimants' submissions to the Trusts disclose medical records, sensitive

personal health information, information about claimants' personal finances, and information

regarding claimants' family members – all of which was disclosed with the expectation that such

information will be kept confidential.  This expectation of confidentiality should not be violated,

---

[7] This Court has jurisdiction over this Motion because the DCPF resides in this district and its compliance with subpoenas is therefore required here.  *See, e.g.*, *N. Atl. Operating Co. v. Dunhuang Grp.*, 2018 WL 338130, at *1-2 (D. Del. July 11, 2018) (adjudicating motion to compel where the subpoenaed party resided in this district but the subpoena required the documents to be produced to an office in Michigan); *Agincourt Gaming, LLC v. Zynga, Inc.*, 2014 WL 4079555, at *4 (D. Nev. Aug. 15, 2014) ("Rule 45 makes clear that the place of compliance is tethered to the location of the subpoenaed person"); *XTO Energy, Inc. v. ATD, LLC*, 2016 WL 1730171, at *20 (D.N.M. Apr. 1, 2016) (noting that "revised rule 45(d)(3) provides that motions to quash or enforce a subpoena can be brought in the district where compliance is required—i.e., the district in which the subpoena's recipient resides or works"); *Raap v. Brier & Thorn, Inc.*, 2017 WL 2462823, at *2 (C.D. Ill. July 7, 2017) (finding "the place of compliance" is tied "to the location of the subpoenaed person or entity.").

especially where, as here, "no need is shown" for information that could include up to 15,000 claimants' private records.  *Mannington Mills, Inc. v. Armstrong World Indus., Inc.*, 206 F.R.D. 525, 529 (D. Del. 2002).

21.    Demands for the production of personal, private information require heightened scrutiny.  *See Shervin v. Partners Healthcare Sys., Inc.*, 2013 WL 5655465, at *4 n.2 (M.D.N.C. Oct. 15, 2013) (ruling that "sensitive and inherently confidential" nature of records "justifies greater caution for the Court in exercising its discretion regarding exposing the records to public scrutiny"); *Zamorano v. Wayne State Univ.*, 2008 WL 29999546, at *3 (E.D. Mich. Aug. 1, 2008) ("[W]hile clearly no federally recognized privilege stands in the way of obtaining this information, the shield of confidentiality that normally protects" sensitive peer review records "justifies greater caution for the Court in exercising its discretion regarding exposing the records to public scrutiny.").

22.    Bestwall's demand for information about as many as 15,000Trust Claimants is overbroad and misaligned with the inquiry it purportedly plans to undertake.  Bestwall seeks the subpoenaed information to determine whether there was a pattern of false claims submissions to it or its predecessor, and whether any such pattern was prevalent.  Bestwall does not need the personal information of up to approximately 15,000 individuals to determine if such a pattern exists.  Producing data for a random sample of up to 10% of the 15,000 claimants would provide a statistically significant sample of the claims in issue, sufficient to satisfy any right Bestwall might have to obtain a representative sample.

23.    Sampling along these lines is a widely accepted principle.  "In some cases that involve a massive number of claims … sampling techniques can streamline discovery …." Manual For Complex Litig. § 22.81 (4th ed. 2020).  For this reason, courts routinely encourage

sampling.  *See, e.g., Fed. Hous. Fin. Agency v. JPMorgan Chase & Co.*, 2012 WL 6000885, at *5, 7-10 (S.D.N.Y. Dec. 3, 2012) (approving sampling as a method to establish liability for fraud, with a sample of 42,700 out of 1.1 million mortgage loans (approximately 4% of the total data)).

24.     Courts have relied upon sampling in asbestos-related litigation.  In *In re Garlock Sealing Technologies*, the Court adopted an estimation approach that was based on questionnaire responses from a sample of the current claimants.  504 B.R. 71, 95 (Bankr. W.D.N.C. 2014).  Similarly, in *National Union Fire Ins. Co. of Pittsburgh v. Porter Hayden Co.*, the court limited disclosure to a random sample of 10% of the claimants at issue.  2012 WL 628493, at *1 (D. Md. Feb. 24, 2012).

25.     Bates White is capable of working with a statistical sample.  Its own website states that sampling "offers a scientifically reliable and cost-effective approach to learning about entire populations from a more manageable subset," and advertises its "significant experience . . . designing samples and developing data collection protocols to draw statistically valid conclusions … in … litigation settings."  *See* Bates White Economic Consulting, "Data Science and Statistics," https://www.bateswhite.com/practices-Data-Science-and-Statistics.html#Overview  (last  visited Apr. 19, 2021).

26.     Accordingly, because a statistically significant sample of the Trust Claimants' data would allow Bestwall to accomplish its stated goals, the subpoenas are overbroad.  There is no need for Bestwall to obtain the confidential data of up to 15,000 Trust Claimants.  Bestwall's subpoenas should therefore be quashed.  *See Apex Fin. Options, LLC*, 2021 WL 965509, at *5 (stating a subpoena should be quashed where it is "an overbroad, general request for unlimited access to [confidential] information.").

27.     Alternatively, consistent with the above analysis, the subpoenas should be modified to provide a randomly selected, sampling-based production of data concerning up to 1,500 mesothelioma victims.  This production would suffice for the analysis that Bestwall seeks to complete, comport with the standards of scientific reliability that courts require when evaluating sampling evidence, and better protect Trust Claimants' highly sensitive data.

**B.      The Subpoenas Must be Quashed or Modified Because Bates White's Plan to Aggregate Non-Anonymized Claimant Data Unjustifiably Increases the Risk of Harm to Trust Claimants.**

28.     Bestwall's production demand raises "big data" concerns that most subpoenas do not.  Bestwall plans to combine the data produced by the DCPF, consisting of private information for up to 15,000 Trust Claimants, into a *single, consolidated database*.  Ex. F (Decl. of Charles Bates – originally attached as Ex. C to the 2004 Motion), ¶¶ 39-40; Ex. G (Reply in Support of the 2004 Motion), ¶ 48.

29.     "[T]he compilation of otherwise hard-to-obtain information alters the privacy interest implicated by disclosure of that information," and a "computerized summary located in a single clearinghouse of information" warrants particular scrutiny.  *U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 763-64 (1989).  Even aggregations of public data present privacy and security concerns, because the "unrestrained power to assemble data that reveal private aspects of identity is susceptible to abuse."  *United States v. Jones*, 565 U.S. 400, 416 (2012) (Sotomayor, J., concurring); *see also U.S. Dep't of Defense v. Fed. Labor Relations Auth.*, 510 U.S. 487, 500 (1994) ("An individual's interest in controlling the dissemination of information regarding personal matters does not dissolve simply because that information may be available to the public in some form."); *Havemann v. Colvin*, 537 F. App'x 142, 147-48 (4th Cir.

2013) (recognizing privacy interest in nondisclosure of information, even if otherwise public, in a format that could be combined with other available data to identify specific individuals).

30.     Bestwall's approach implicates all of these concerns.  Centralizing the Trust Claimants' data into a single database (regardless of the security measures) creates a powerful, analytical tool that may be abused to discern patterns and reveal insights about individual claimants on subjects unrelated to Bestwall.  The aggregation of this data puts more Trust Claimant data (both in terms of the number of claimants and the amount of data for each claimant) at risk of inadvertent disclosure or misappropriation, and amplifies the potential consequences of even a single data breach – as the theft of a single file could compromise personal data concerning more than 15,000 people.

31.     The risk that such a merged database, once created, could be used in a manner detrimental to the privacy interests of individual Trust Claimants, particularly if it is misappropriated or inadvertently disclosed (*e.g.*, because of a data breach), is profound.  For this reason alone, the subpoenas should be quashed.

### C.    The Subpoenas Must be Quashed or Modified Because Providing Bates White with Non-Anonymized Data Unjustifiably Increases the Risk of Harm to the Trust Claimants.

32.     The risk of harm is further compounded by the fact that the subpoenas require the DCPF to provide Bates White – a commercial third party – with non-anonymized data relating to the Trust Claimants.

33.     Bates White specializes in providing analysis to companies and law firms.  It "guides clients to make decisions about issues involving asbestos."  It holds out its "Environmental and Product Liability" practice as a "market leader" in liability forecasting.  *See* Bates White Economic        Consulting,        "Environmental        and        Product        Liability,"

https://www.bateswhite.com/practices-Environmental-Product-Liability.html (last visited Apr. 19, 2021).

34.     The Trusts' databases have significant commercial value, particularly to experts and insurers in the business of pricing asbestos liability, as they would otherwise need to devote significant resources to gathering the data assembled by the Trusts.[8]

35.     Bestwall has tried to minimize concerns by citing Bates White's history of working with information that is highly sensitive.  Ex. F, ¶ 25 Bates White's history and the commercial services it currently provides, however, do anything but minimize the risk of a data breach.  The mass production of such aggregated, non-anonymized data to Bates White, an organization that has a pecuniary commercial interest in data related to asbestos liability[9], viewed from the perspective of minimizing the risk of a data breach or misuse, is both inappropriate and unnecessary.

36.     Alternatively, if the subpoenas are not quashed, this risk may be reduced by modifying the subpoenas to allow the DCPF to anonymize the data before it is produced to Bates White.  The DCPF already has custody of and access to all the Trust Claimants' data, and is qualified to anonymize the data.

---

[8] To illustrate, the leaders of Bates White previously ran a side business, the Litigation Resolution Group ("LRG"), which they marketed as a private alternative to 524(g) trusts.  For a price, LRG would assume the asbestos liabilities of companies that chose to remain in the tort system.  Heather Isringhausen Gvillo, *Database provides insight into how much asbestos claims are worth*, Madison – St. Clair Record (May 14, 2015), https://madisonrecord.com/stories/510558049-database-provides-insight-into-how-much-asbestos-claims-are-worth.  Access to the Trusts' data would enable a business like LRG to more accurately quantify and price companies' expected asbestos liabilities—and would therefore be hugely valuable.

[9] Bates White has already incurred over $10.5 million in fees in the Bestwall bankruptcy case.  Ex. D, 3 n.3.

37.     In sum, Bates White's plan to create an aggregate database from non-anonymized data creates an unjustifiable risk of harm to the Trust Claimants and warrants quashing the subpoenas.[10]   In the alternative, along with modifying the subpoenas to only provide a randomly selected sampling size of up to 1,500 Trust Claimants' data, the subpoenas should be modified to permit DCPF to anonymize the data before it is provided to Bates White.

---

[10]  The Trusts further note that the subpoenas should also be quashed because they were served by mail – not personal service as required by Rule 45.  *See, e.g.*, *Kabbaj v. Simpson,* 2013 U.S. Dist. LEXIS 55582, at *14-16 (D. Del. Mar. 7, 2013) (stating service of Rule 45 subpoena by certified mail was improper); *Ricoh Co. v. Oki Data Corp.*, 2011 U.S. Dist. LEXIS 90297, at *13-14 (D. Del. Aug. 15, 2011) (stating that "the District of Delaware leans towards the majority rule" that the service required by Rule 45(b) is "personal service.").

## **CONCLUSION**

For the reasons set forth above, the Trusts respectfully request the Court enter an order quashing or modifying the subpoenas served on the Trusts and DCPF.

Dated: April 19, 2021

*/s/ Beth Moskow-Schnoll*
Beth Moskow-Schnoll (DE No. 2900)
Ballard Spahr LLP
919 N. Market Street, 11th Floor
Wilmington, DE 19801
Tel: (302) 252-4447
moskowb@ballardspahr.com

*Attorneys for Armstrong World Industries, Inc. Asbestos Personal Injury Settlement Trust; Celotex Asbestos Settlement Trust; Flintkote Asbestos Trust; Pittsburgh Corning Corporation Personal Injury Settlement Trust; WRG Asbestos PI Trust; Federal-Mogul Asbestos Personal Injury Trust; Babcock & Wilcox Company Asbestos PI Trust; United States Gypsum Asbestos Personal Injury Settlement Trust; and Owens Corning / Fibreboard Asbestos Personal Injury Trust*