# EXHIBIT D

# UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### Charlotte Division

```
-----------------------------------------------------------x
                                    :  Chapter 11
In re:                              :
                                    :  Case No. 17-BK-31795 (LTB)
BESTWALL LLC,                       :
                                    :
        Debtor.                     :  Hrg. Date:  9/24/2020 at 9:30 AM
                                    :  Obj. Deadline:  9/4/2020
                                    :  Re:  Document No. 1237
-----------------------------------------------------------x
```

## RESPONSE AND OBJECTION OF NONPARTIES MANVILLE PERSONAL INJURY SETTLEMENT TRUST AND DELAWARE CLAIMS PROCESSING FACILITY TO THE DEBTOR'S MOTION FOR BANKRUPTCY RULE 2004 EXAMINATION OF ASBESTOS TRUSTS AND GOVERNING CONFIDENTIALITY OF INFORMATION PROVIDED IN RESPONSE

B. Chad Ewing
WOMBLE BOND DICKINSON (US) LLP
One Wells Fargo Center, Suite 3500
301 South College Street
Charlotte, North Carolina  28202
(704) 331-4996

-and-

Jason C. Rubinstein (admitted *pro hac vice*)
Timothy M. Haggerty (admitted *pro hac vice*)
Michael S. Palmieri (admitted *pro hac vice*)
FRIEDMAN KAPLAN SEILER
   & ADELMAN LLP
7 Times Square
New York, New York  10036-6516
(212) 833-1100

Dated:  September 4, 2020

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................. ii

PRELIMINARY STATEMENT ............................................................................................1

BACKGROUND .....................................................................................................................5

    A.    The Manville Trust, the DCPF, and the Trust Distribution Processes ....................5

    B.    The Manville Trust's and DCPF's Disclosure Procedures .......................................7

    C.    The Manville Trust's and DCPF's Data Licensing Practices ................................10

    D.    The Proposed Rule 2004 Discovery .......................................................................12

    E.    The Copycat Rule 2004 Motion in *DBMP* ............................................................13

INCORPORATION OF ARGUMENTS AND RESERVATION OF RIGHTS ...........................14

ARGUMENT ........................................................................................................................14

I.    THE MOTION PRESENTS EXTRAORDINARY PRIVACY CONCERNS .................16

    A.    The Debtor Demands the Disclosure of Sensitive Personal Information ..............16

    B.    The Debtor Seeks Proprietary and Commercially Sensitive Information ............18

    C.    The Debtor's Plans to Aggregate Claimant Data Raise the Privacy
           and Confidentiality Stakes, and Support Restricting the Scope, of
           Disclosure ...............................................................................................................20

II.    THE DEBTOR LACKS A LEGITIMATE NEED FOR DATA FOR 15,000
    MESOTHELIOMA VICTIMS OR PII FOR ANY OF THEM .....................................23

    A.    Any Production Should Be Limited to a Sample ....................................................24

    B.    Because the Debtor Has No Need for Claimants' PII,
           Any Production Should Be Made on an Anonymized Basis ..................................26

    C.    The Debtor Does Not Need Most of the Datafields It Seeks .................................30

    D.    The Debtor's Requested Discovery Will Implicate
           Asbestos Victims With No Connection to this Case .............................................30

III.    COMPLIANCE WITH THE SUBPOENAS WOULD IMPAIR
    CLAIMANTS' FAITH IN THE MANVILLE TRUST AND DCPF .............................32

**Page**

IV.    THE PROPOSED ORDER'S USE AND CONFIDENTIALITY PROVISIONS
       ARE UNSUITED TO THE SENSITIVITY OF THE TRUSTS' DATA..........................33

CONCLUSION..............................................................................................................................35

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Bennett Funding Grp., Inc.*,
    203 B.R. 24 (Bankr. N.D.N.Y. 1996) ....................................................................15

*Congoleum Corp. v. ACE Am. Ins. Co.*,
    Misc. No. 09M-01-084 (Del. Super. Ct. Aug. 4, 2009) ........................................25

*In re Eagle-Picher Indus., Inc.*,
    169 B.R. 130 (Bankr. S.D. Ohio 1994) ................................................................15

*Entral Group Int'l, LLC v. YHCL Vision Corp.*,
    436 F. Supp. 2d 404 (E.D.N.Y. 2006) .................................................................17

*Fed. Hous. Fin. Agency v. JPMorgan Chase & Co.*,
    Civ. No. 11-CV-6188, 2012 WL 6000885 (S.D.N.Y. Dec. 3, 2012) ....................25

*Fed.-Mogul Prods., Inc. v. AIG Casualty Co.*,
    No. MRS-L-2535-06 (N.J. Sup. Ct. Report & Recommendation of Special
    Discovery Master, dated July 20, 2011) ..............................................................27

*Frost v. Perry*,
    161 F.R.D. 434 (D. Nev. 1995)............................................................................20

*In re Garlock Sealing Techs., LLC, et al.*,
    No. 10–31607 (Bankr. W.D.N.C.) ................................................................ *passim*

*Goard v. Crown Auto, Inc.*,
    6:15-CV-35, 2017 WL 6381703 (W.D. Va. Jan. 5, 2017).....................................23

*Gonzales v. Google, Inc.*,
    234 F.R.D. 674 (N.D. Cal. 2006).....................................................................32, 33

*Havemann v. Colvin*,
    537 F. App'x 142 (4th Cir. 2013) .......................................................................21

*Hughes v. Twenty-First Century Fox, Inc.*,
    327 F.R.D. 55 (S.D.N.Y. 2018) ..........................................................................23

*In re Glitnir banki hf.*, No. 08-14757 (SMB), 2011 WL 3652764
    (Bankr. S.D.N.Y. Aug. 19, 2011) .......................................................................16

*Insulate Am. v. Masco Corp.*,
    227 F.R.D. 427 (W.D.N.C. 2005)...................................................................18, 23

**Page(s)**

*In re Joint E. & S. Dist. Asbestos Litig. (Findley v. Blinken),*
129 B.R. 710 (E. & S.D.N.Y. Bankr. 1991) ...........................................................................5

*In re Joint E. & S. Districts Asbestos Litig.,*
878 F. Supp. 473 (E.D.N.Y. 1995) ......................................................................................33

*McLaughlin v. McPhail,*
707 F.2d 800 (4th. Cir. 1983) .............................................................................................14

*Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Porter Hayden Co.,*
No. 03-cv-3408-CCB (D. Md. Stipulated Protective Order, filed Apr. 19, 2011
and entered Apr. 20, 2011) ................................................................................................27

*National Union Fire Ins. Co. of Pittsburgh v. Porter Hayden Co.,*
Civ. No. CCB-03-3408, 2012 WL 628493 (D. Md. Feb. 24, 2012) .......................................25

*Nw. Mem. Hosp. v. Ashcroft,*
362 F.3d 923 (7th Cir. 2004) .............................................................................................17

*In re Ramadan,*
No. 11-02734-8-SWH, 2012 WL 1230272 (Bankr. E.D.N.C. Apr. 12, 2012) ........................14

*Ruggles v. WellPoint, Inc.,*
Civ. No. 1:08-CV-201, 2010 WL 11570681 (N.D.N.Y. Dec. 28, 2010) ................................24

*Shervin v. Partners Healthcare Sys., Inc.,*
No. 1:13MC23, 2013 WL 5655465 (M.D.N.C. Oct. 15, 2013) ......................................16, 32

*Singletary v. Sterling Transp. Co.,*
289 F.R.D. 237 (E.D. Va. 2012) .........................................................................................17

*State v. DeFusco,*
620 A.2d 746 (Conn. 1993) ...............................................................................................17

*In re Subpoena of DJO, LLC,*
295 F.R.D. 494 (S.D. Cal. 2014) ........................................................................................19

*In re SunEdison, Inc.,*
562 B.R. 243 (Bankr. S.D.N.Y. 2017) .................................................................................15

*In re SunEdison, Inc.,*
572 B.R. 482 (Bankr. S.D.N.Y. 2017) ............................................................................15, 26

*In re Symington,*
209 B.R. 678 (Bankr. D. Md. 1997) ...............................................................................15, 16

*U.S. Dep't of Defense v. Fed. Labor Relations Auth.,*
510 U.S. 487 (1994)...........................................................................................................21

                                                                                    **Page(s)**

*U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press*,
    489 U.S. 749 (1989) ..................................................................................20

*U.S. Equal. Emp. Opportunity Comm'n v. McCormick & Schmick's Seafood
    Rests.*,
    No. DKC-11-2695, 2012 WL 2577795 (D. Md. July 2, 2012) .............................17

*U.S. Equal Emp. Opportunity Comm'n v. SleeveCo, Inc.*,
    No. 2:08-CV-00106-SSC, 2008 WL 11334159 (N.D. Ga. Dec. 8, 2008) ..............17

*United States v. Jones*,
    565 U.S. 400 (2012) ..................................................................................20

*United States v. Meridian Senior Living, LLC*,
    5:16-CV-410-BO, 2018 WL 5723930 (E.D.N.C. Nov. 1, 2018) ...........................23

*In re Wilcher*,
    56 B.R. 428 (Bankr. N.D. Ill. 1985) ...............................................................15

*In re Yahweh Ctr., Inc.*,
    No. 16-04306-5-JNC, 2017 WL 327473 (Bankr. E.D.N.C. Jan. 23, 2017)...........15

**Statutes & Rules**

Bankruptcy Code Section 524(g)....................................................................5, 20

FED. R. BANKR. P. 2004 ........................................................................... *passim*

FED. R. BANKR. P. 9014(c)...............................................................................15

FED. R. CIV. P. 26(c) ......................................................................................16

FED. R. CIV. P. 45 ....................................................................................16, 18

**Other Authorities**

Wright, Miller, et al., 8A FED. PRAC. & PROC. CIV. § 2043 (3d ed.) ............................19

9 COLLIER ON BANKR. ¶ 2004.01 (16th ed.) .....................................................15

Heather Isringhausen Gvillo, *Database provides insight into how much asbestos
    claims are worth*, MADISON-ST. CLAIR RECORD, May 14, 2015,
    http://madisonrecord.com/issues/302-asbestos/270770-database-provides-
    insight-into-how-much-asbestos-claims-are-worth ............................................23

MANUAL FOR COMPLEX LITIG. § 22.81 (4th ed. 2020) .............................................24

Nonparties Manville Personal Injury Settlement Trust (the "**Manville Trust**") and Delaware Claims Processing Facility ("**DCPF**"), which processes asbestos-related personal injury claims on behalf of multiple personal injury settlement trusts, file this response and objection to Debtor Bestwall LLC's ("**Bestwall**" or the "**Debtor**") Motion for (i) Bankruptcy Rule 2004 Examination of Asbestos Trusts [Dkt. No. 1237] (the "**Motion**" or "**Mot.**") and (ii) an Order Governing Confidentiality of Information Provided in Response [Dkt. No. 1238] (the "**Proposed Order**").[1]

## PRELIMINARY STATEMENT

1.      The Manville Trust and DCPF's client trusts were established to fairly compensate individuals who suffered personal injuries from exposure to asbestos or asbestos-containing products sold, manufactured, or distributed by the trusts' predecessors.  As an essential part of the claims resolution process, they require claimants to make detailed, highly confidential submissions to allow the trusts to substantiate and value their claims.  The trusts each maintain such information in proprietary databases, subject to rigorous security protocols designed to safeguard its confidentiality.

2.      Here, the Debtor seeks authorization to serve Rule 2004 subpoenas that would require the Manville Trust and DCPF to produce sensitive, confidential information for 15,000 mesothelioma victims.  The Debtor argues that such sweeping disclosure is necessary to "answer the important question of whether Bestwall was subject to . . . evidence manipulation in its historical mesothelioma cases" and to value its aggregate mesothelioma liability (even though

---

[1]  Unless otherwise noted, all undefined and abbreviated terms herein have the same meaning as in the Motion.  The factual bases for this Response and Objection are set forth in the accompanying declarations of Jared S. Garelick ("**Garelick Decl.**"), Richard Winner ("**Winner Decl.**"), and Timothy M. Haggerty ("**Haggerty Decl.**").  "*Garlock*," "*DBMP*," "**ACC**," and "**FCR**" refer to *In re Garlock Sealing Techs., LLC, et al.*, No. 10–31607 (Bankr. W.D.N.C.), *In re DBMP LLC*, No. 20-30080 (Bankr. W.D.N.C.), the Official Committee of Asbestos Claimants, and the Future Claimants' Representative, respectively.

the Court has not ordered estimation). Mot. at 3, 4. The Debtor has no current "need" for disclosure that, at most, relates to an unripe dispute.

3. The Motion's overreaching character is also evidenced by the Debtor's request for invasive, personal data that goes far beyond any purported "need," its refusal to accept data for a sample of claimants, and its attempt to impose only the barest use and confidentiality restrictions on the trusts' data. These defects, and the imperative of protecting the privacy of 15,000 mesothelioma victims and their families, all militate against the Motion.

4. If the Court concludes that Rule 2004 discovery can proceed at all, it should significantly limit the scope of disclosure and impose anonymization, confidentiality, and use restrictions on any production that are at least as strict as those ordered by the Court in its July 2015 ruling allowing the *Garlock* debtors to subpoena the Manville Trust. The Debtor widely cites that ruling, but disregards its key teachings in what appears to be a coordinated effort to subvert the data privacy protections imposed by the Court in *Garlock*. Just weeks after filing the Motion, the debtor in *DBMP* (represented by the same counsel and backed by the same experts (Bates White) as the Debtor) filed an almost verbatim motion against the Manville Trust and DCPF, seeking the same overly broad discovery (as to another set of mesothelioma victims), subject to the same lax use, confidentiality, and data retention limitations proposed by the Debtor here.[2] The disclosure sought by the Debtor and the proposed scope and terms of such disclosure are objectionable.

5. *First*, the Debtor seeks sensitive claims data about individual mesothelioma victims. The Manville Trust and DCPF trusts are duty bound to protect these

---

[2] The Manville Trust and DCPF will be filing their response and objection to the *DBMP* motion on September 28, and the Court is currently scheduled to hear argument on that motion on October 6.

claimants' data because many of them are the trusts' beneficiaries.  To that end, and to protect

the privacy of other victims, the Manville Trust and DCPF trusts have exercised their ownership

of and control over their claims data to protect such data from improper disclosure and from

exploitation—including by businesses, like Bates White, that specialize in, and make millions of

dollars off of, pricing asbestos liability.[3]  For the same reasons, the trusts do not commingle their

data.  And contrary to the Debtor's assertion that the trusts routinely provide litigants with bulk

disclosure of such data, they have historically resisted producing it *en masse* to asbestos debtors

and others.  Accordingly, the Manville Trust and DCPF vehemently object to the Debtor's effort

to pool sensitive claims data concerning 15,000 mesothelioma victims from 11 separate trusts

into a centralized database accessible to scores of professionals involved in this case, without

regard to their need for such access and subject to lax use and confidentiality rules.  *Infra* Pt. I.

      6.    *Second*, the Debtor seeks data for 15,000 mesothelioma victims, even

though its analysis will almost certainly rely on statistical sampling, not assessments of

individual claims, and even though data for a sample of the 15,000 victims would suffice.  The

Court should reject this facially overbroad request.  *Infra* Pt. II.A.

      7.    *Third*, the Debtor seeks claimants' personally identifiable information

("**PII**"), such as their names, social security numbers ("**SSNs**"), and dates of birth—even though

it does not need PII to discern patterns of inconsistent claims filings or to value its aggregate

mesothelioma liability.  The Debtor has rejected all proposals for an anonymizing protocol that

would scrub PII from the trusts' productions.  In view of the private nature of the data sought and

the limited purposes for which the Debtor purports to seek it, this Court should order

---

[3]  To illustrate, Bates White has already incurred over $10.5 million in fees in this case [Dkt. No. 1233], and $530,000 in fees in *DBMP* [DBMP Dkt. No. 379].

anonymization. Tellingly, while trumpeting the fact that the Manville Trust and DCPF were subject to "similar discovery" in *Garlock*, Mot. at 5, the Debtor fails to disclose that this Court ordered that the Manville Trust's disclosure in *Garlock* (and any datasets derived from it) be anonymized. *Infra* Pt. II.B. Relatedly, in addition to seeking PII it does not need, the Debtor requests several other classes of data that are irrelevant to the analysis it intends to undertake. The Court should deny the Debtor such discovery. *Infra* Pt. II.C.

8.      *Fourth*, the methodology the Debtor would require the Manville Trust and DCPF to employ in identifying responsive claims data (*i.e.*, relying on SSNs without another identifier for this purpose) will require them to produce data for claimants who have no connection to Bestwall or its predecessor, and whose data are therefore *per se* irrelevant. The Court should deny the Debtor such disclosure. *Infra* Pt. II.D.

9.      *Fifth*, an order permitting the disproportionate discovery sought by the Debtor would upend asbestos victims' expectations that their submissions to the Manville Trust and DCPF trusts will remain confidential, undermine victims' faith in the claims process, and impair the trusts' ability to fairly and efficiently resolve claims. *Infra* Pt. III.

10.     *Sixth*, the Proposed Order's terms governing the use, confidentiality, and retention of the Manville Trust's and DCPF trusts' data are woefully deficient. *Infra* Pt. IV.

11.     The Manville Trust and DCPF strive to strike the appropriate balance between safeguarding the legitimate privacy interests of asbestos victims and cooperating with valid discovery demands, and they raise none of these concerns lightly. Because the Manville Trust and DCPF attempted, but were unsuccessful in, resolving these concerns with the Debtor, they are now constrained to ask this Court to deny the Motion, or at minimum, to restrict the scope and terms of the Debtor's requested discovery.

# BACKGROUND

### A.    The Manville Trust, the DCPF, and the Trust Distribution Processes

12.    The Manville Trust was formed on November 28, 1988 to resolve asbestos personal injury claims against Johns-Manville Corporation ("**Johns-Manville**").[4] Johns-Manville had been the largest North American producer of asbestos and asbestos-containing products. Johns-Manville filed a petition under Chapter 11 of the Bankruptcy Code in August 1982 due to its projected personal injury liabilities. Its reorganization was completed on November 28, 1988, and the Manville Trust became operational on the same date. Thereafter, the Manville Trust became the exclusive entity from which to seek compensation for existing and future asbestos health claims caused by exposure to Johns-Manville products. Its goal is to treat all claimants equitably. Garelick Decl. ¶ 2.

13.    DCPF was formed in 2006 to administer and process asbestos-related personal injury claims on behalf of multiple personal injury settlement trusts (the "**DCPF Trusts**," and together with Manville Trust, the "**Trusts**").[5] The DCPF Trusts were established pursuant to Section 524(g) of the Bankruptcy Code, and are charged with ensuring that claimants' asbestos-related personal injury claims are processed and, when appropriate, settled in

---

[4] *See In re Joint E. & S. Dist. Asbestos Litig. (Findley v. Blinken)*, 129 B.R. 710, 752 (E. & S.D.N.Y. Bankr. 1991), *vacated*, 982 F.2d 271 (2d Cir. 1992), *modified on reh'g*, 993 F.2d 7 (2d Cir. 1993).

[5] The Debtor seeks discovery from the following DCPF Trusts: Armstrong World Industries Asbestos Personal Injury Settlement Trust; Babcock & Wilcox Company Asbestos Personal Injury Settlement Trust; Celotex Asbestos Settlement Trust; DII Industries, LLC Asbestos PI Trust (Halliburton, Harbison-Walker Sub-funds); Federal Mogul U.S. Asbestos Personal Injury Trust ("**Federal Mogul**") (T&N, FMP, and Flexitallic Sub-funds); Flintkote Asbestos Trust; Owens Corning Fibreboard Asbestos Personal Injury Trust (FB and OC Subfunds); Pittsburgh Corning Corporation Asbestos PI Trust; United States Gypsum Asbestos Personal Injury Settlement Trust; and WRG Asbestos PI Trust. Proposed Order ¶ 2.

The Debtor seeks discovery from two other Federal Mogul sub-funds, Vellumoid, and Fel-Pro. *See id.* Those sub-funds are not DCPF clients, and DCPF does not have access to their records. *See* Winner Decl. ¶ 4.

accordance with bankruptcy court directives.  Like the Manville Trust, the goal of the DCPF

Trusts is to treat all claimants fairly, equitably, and reasonably in light of the limited assets

available.  Garelick Decl. ¶¶ 2-3; Winner Decl. ¶ 2 & Exs. A-C.

14.    To further their shared goal, the Trusts have established (and the

bankruptcy courts that oversee their affairs have approved) Trust Distribution Processes or

similar procedures ("**TDPs**") for processing and evaluating claims with the intention of paying

all claimants over time as equal a share as possible of their claims' values.  Garelick Decl. ¶ 3 &

Ex. A; Winner Decl. ¶ 5 & Exs. A-C.  The TDPs require claimants to submit detailed

information to substantiate and value their claims.  For claims against the Manville Trust, this

information is submitted to, and processed by, the Claims Resolution Management Corporation

("**CRMC**").  For claims against any of the DCPF Trusts, claimants submit their information to

DCPF, which administers each claim pursuant to the relevant trust's TDP.  Regardless of

whether they are held by the claims processing facility or the individual trust, the claims data

belong to the Trusts.  Garelick Decl. ¶¶ 4-5 & Ex. A; Winner Decl. ¶¶ 5-6, 8 & Exs. A-C.[6]

15.    By its very nature, such information is highly sensitive, personal, and

confidential.  In addition to PII and other personal demographic data, it includes medical records,

which can detail sensitive personal information unrelated to asbestos injuries (*e.g.*, a claimant's

history of drug and alcohol abuse) and other private health information.  Such submissions often

also include confidential information concerning claimants' finances and their spouses and

dependents.  Garelick Decl. ¶ 5; Winner Decl. ¶ 6.

---

[6] For this reason, if the Court grants the Motion, the Debtor should subpoena the individual DCPF Trusts,
not DCPF, and this Objection should not be construed to limit or waive any objections the individual
DCPF Trusts (or the individual claimants) might have to such subpoenas.

16.     Claimants submit such personal, sensitive information with the expectation that it will stay confidential.  The free flow of such information is necessary to the claims resolution process.  If claimants are not able to trust that the personal information they submit to resolve their claims will be kept in strict confidence, then the claims resolution process (created to enable efficient and equitable payment of qualifying claims without burdening the court system) would be undermined.  Garelick Decl. ¶ 6; Winner Decl. ¶ 7.

**B.     The Manville Trust's and DCPF's Disclosure Procedures**

17.     The confidentiality of claimant information submitted to the Trusts, and the Trusts' duties to maintain that information in confidence, is so fundamental that it is memorialized in the Trusts' court-approved organizing documents, and in their other governing documents.  *See, e.g.*, Winner Decl. ¶ 8 & Ex. A § 6.5.  Likewise, for DCPF, protecting the security of sensitive claims data is its highest operational priority.  The DCPF Trusts expressly require that all claimant information be treated as highly confidential and safeguarded accordingly.  Winner Decl. ¶ 8.

18.     Consistent with their confidentiality obligations, the Manville Trust and DCPF have adopted strict practices to protect claimant information.  They regard all information relating to individual claimants as highly confidential, and routinely decline to release such information absent the consent of the affected claimant or a valid subpoena.  Garelick Decl. ¶¶ 5-14, 16-17; Winner Decl. ¶¶ 5-20.

19.     Their data protection measures are rigorous.  For example, DCPF has implemented a customized, proprietary claims platform, "**Trust Online**," to facilitate the secure transmission, management, review, and retention of confidential claimant data.  DCPF routinely enhances Trust Online to implement state-of-the-art data security measures, all access to claimant data is monitored, and access limitations are stringent.  DCPF employees are permitted

7

to access only the information that is necessary for them to do their jobs (access levels are

determined based on each individual employee's role), and DCPF maintains supplemental

security protocols to prevent any misuse of such information.  As a further security measure,

SSNs are never stored, or correlated, with other claimant data in Trust Online.  Claimants' SSNs

are maintained separately in a restricted and encrypted location that contains only the SSNs and

correlated hashed values (with no other claimant data).  Winner Decl. ¶¶ 10-16.

   20. Whenever data submitted to the Manville Trust or DCPF may be subject

to production pursuant to a lawfully issued and validly served subpoena for an individual

claimant's records,[7] the Trusts' TDPs require that written notice of the subpoena be provided to

the claimant's counsel.  Claimant's counsel is then afforded a reasonable period to take

protective action before any production is made, and if the claimant moves to modify or quash

the subpoena, any production is deferred pending the resolution of that motion.  If any

production is made, the Manville Trust does not produce the claimant's full SSN, and the DCPF

redacts the claimants' SSN entirely.  Garelick Decl. ¶ 17; Winner Decl. ¶ 20.

   21. The Debtor suggests that the Manville Trust and DCPF "routinely

respond" to the sort of mass discovery the Debtor seeks here, and that they "routinely provide[]"

data for thousands or tens of thousands of asbestos claimants, Mot. at 21.  This assertion is

entirely erroneous.[8]  Both the Manville Trust and DCPF are concerned that mass subpoenas, like

the ones the Debtor seeks to serve, implicate all of the confidentiality considerations discussed

above, albeit on a massive scale with respect to thousands of individuals and their families.

---

[7]  In the ordinary course, DCPF requires that requesting parties direct subpoenas to its client trusts, rather
than DCPF.  *See supra* n.4 & Winner Decl. ¶ 19.

[8]  The Debtor cites nothing to support this claim as to DCPF.  As to the Manville Trust, the Debtor cites
published procedures governing subpoena responses, *see* Mot. at 21, but ignores that those procedures
apply only to individual subpoenas, not mass subpoenas, *see infra* ¶ 24 & Garelick Decl. ¶¶ 15-18.

Those concerns are compounded by the centralized, easily searchable manner in which such data must be produced, and the receiving party's intent to merge the data with other data concerning the same claimants. This compilation of thousands of individuals' personal information into a single database raises confidentiality, data privacy, and data security concerns that subpoenas in individual actions do not. *See* Garelick Decl. ¶¶ 18-20; Winner Decl. ¶¶ 21-23.

22.     Moreover, the Manville Trust and DCPF appreciate that the use of claimant information in mass tort litigations or bankruptcies (such as this case) is fundamentally different from the use of such information in individual cases. While conventional tort cases require the adjudication of legal and factual issues on an individualized basis, including findings specific to each claimant, mass adjudications entail fact-finding as to representative claimants, and the extensive use of sampling and other techniques (*e.g.*, bellwether trials) to resolve legal and factual issues on an aggregate basis. *See* Garelick Decl. ¶ 18; Winner Decl. ¶ 21.

23.     Because of the highly sensitive nature of the claimant data they maintain, the Manville Trust and DCPF oppose the disclosure of such data on a wholesale basis in mass tort litigations where, as here, at most a random, anonymized sampling of such data is likely to be necessary to the adjudication. *See* Garelick Decl. ¶ 19; Winner Decl. ¶ 22.

24.     While the Manville Trust has published procedures that describe its standard processes upon receipt of a subpoena that has been validly issued in connection with litigation involving asbestos defendants in the tort system, *see* Garelick Decl. ¶¶ 15-18 & Ex. B, those procedures relate to targeted subpoenas seeking only a single claimant's records. They are not geared to subpoenas that seek data relating to thousands or tens of thousands of claimants.

25.     Moreover, the mass aggregation of claimant data is such a core concern that DCPF's systems are designed to ensure that it does not commingle any of its client trust's

data with any other client trust's data. This restriction on commingling is embedded in DCPF's claims processing agreements with the DCPF Trusts, *see* Winner Decl. ¶ 16, and it is entirely at odds with the Debtor's plan here to commingle 11 Trusts' data to create a merged database.

26.     Accordingly, when served with a subpoena seeking information about thousands or tens of thousands of claimants, the Trusts attempt to work with the party seeking disclosure to (a) limit the use and disclosure of PII, and (b) craft a sampling protocol that satisfies that party's valid need for disclosure but that obviates the need for the Trusts to disclose claimant data and documents/information that will not be used by the requesting party for the purpose for which disclosure is sought. In the past, the sampling protocols have resulted in their producing claimant data for approximately 10% of the claim files originally requested by the mass subpoena, pursuant to stringent limitations on the use or disclosure of PII (or with such information redacted altogether). *See* Garelick Decl. ¶ 20.

## C.     The Manville Trust's and DCPF's Data Licensing Practices

27.     DCPF and the DCPF Trusts have never sold or licensed any claimant data. Winner Decl. ¶ 17.

28.     The Debtor asserts that "[t]he Manville Trust for many years provided complete copies of its entire database to experts for a fee (which is how Debtor's expert Bates White obtained its copy of the database from 2002), and until 2007 licensed copies to members of the public (including Bates White) for a fee." Mot. at 22. This assertion is misleading and irrelevant.

29.     The Manville Trust has consistently maintained its data as proprietary and highly confidential, sharing it rarely, and only under rigid confidentiality and use restrictions. Its data protection regime has become progressively stricter over the past two decades, as

10

technological developments have increased the risks and consequences of the misuse of PII.
Garelick Decl. ¶ 22.

30.     Because of data privacy concerns, the Manville Trust has not sold extracts
from its database to anyone since 2002, and on the few occasions when it sold such extracts, it
required the purchaser to acknowledge the confidential and proprietary character of the data, and
imposed stringent use and confidentiality restrictions. *Id.* ¶¶ 23-25.  Although the Manville Trust
granted Bates White a limited license to Manville Trust data in June 2004, *over 16 years ago*,
that license has long since expired, and the Manville Trust has not granted anyone a license for
any of its data since 2011.  Further, the Manville Trust never licensed its "entire database."  The
information it once made available to licensees was limited to approximately three dozen
datafields.  The entire database is exponentially larger than this limited universe. *Id.* ¶¶ 25-29.

31.     The terms of the decades-old agreements under which Bates White
obtained permission to use limited Manville Trust data underscore the sensitivity of the data.
Bates White acknowledged that the Manville Trust data "has proprietary value . . . and . . .
includes confidential medical and other information" regarding Manville Trust claimants. *Id.*
Ex. C at 1 & Ex. D § 7.  Bates White also agreed to:

- "use its best efforts to maintain the confidentiality" of [PII] "regarding Manville Trust claimants";

- not disclose such information (even to its own clients);

- restrict access to the data to employees with a "need to know"; and

- be subject to "injunctive . . . relief . . . to prevent" the unauthorized use or disclosure of such information. *Id.* Ex. C at 1-2 & Ex. D § 7.

Every other licensee of Manville Trust data agreed to similar restrictions.  Garelick Decl. ¶ 27.

**D.**     **The Proposed Rule 2004 Discovery**

32.    On July 30, 2020, the Debtor filed the Motion seeking leave to serve

subpoenas on the Manville Trust and DCPF (or certain of its client trusts) pursuant to Rule 2004.

The terms and conditions of such disclosure are spelled out in the Proposed Order.

33.    The disclosure sought by the Debtor would require the production of data

for claimants in the Trusts' respective databases who match one of the approximately 15,000

individuals who "asserted mesothelioma claims against the Debtor or the former Georgia-Pacific

LLC . . . that were resolved by settlement or verdict and for whom Debtor possesses [SSNs]."

Proposed Order ¶ 3. For each such individual, the Debtor seeks the following data:

a.      Full name of injured party;

b.      Injured party SSN;

c.      Gender of injured party;

d.      Date of birth of injured party;

e.      Date of death of injured party;

f.      State of residency of injured party;

g.      Date of diagnosis of injured party;

h.      Claimed disease and disease body site (if available);

i.      Full name of any claimant who is not the injured party and his or her SSN;

j.      Claimant's law firm, jurisdiction of tort claim filing, and date of tort claim filing;

k.      Date claim filed against Trust;

l.      Date claim approved by Trust, if approved;

m.      Date claim paid by Trust, if paid;

n.      If not approved or paid, status of claim;

o.      All exposure-related fields, including:

i.    Date(s) exposure(s) began;

ii.   Date(s) exposure(s) ended;

iii.  Manner of exposure;

iv.   Occupation and industry when exposed; and

v.    Products to which exposed;

p.    Mode of review selected; and

q.    Mode of review under which claim was approved and paid.

*Id.* ¶ 6.

34.    The Proposed Order contemplates that Bates White will commingle the data produced by the Manville Trust with the data that DCPF produces for ten of its client trusts (which, as noted, do not commingle their data), and that the combined data from the Trusts will then be commingled with "any preexisting electronic information or database" into a "Merged Database." *Id.* ¶ 7.d.

35.    After reviewing the Motion and Proposed Order, the Manville Trust and DCPF conferred with the Debtor to raise their concerns (*see infra*) about the requested discovery. They informed the Debtor that they oppose the Motion in its entirety, and also raised a series of specific deficiencies in the Proposed Order.  While these discussions resolved one of the Proposed Order's deficiencies,[9] the Manville Trust's and DCPF's other concerns remain unresolved as of this filing.  Haggerty Decl. ¶¶ 2–14.

### E.    The Copycat Rule 2004 Motion in *DBMP*

36.    Less than three weeks after filing the Motion, the debtor in *DBMP* (represented by the same counsel) filed a nearly identical motion seeking the same discovery

---

[9]  The resolution of this concern is described in Paragraph 3 of the Haggerty Declaration.

from the Manville Trust and DCPF. Like this Motion, that one annexed a declaration from the principal of Bates White. The *DBMP* motion recapitulates the same deficiencies as the Motion, including its selective and misleading description of the Court's July 2015 ruling in *Garlock*. Apart from the different name in the caption, the *DBMP* motion differs from the Motion only in that it seeks discovery as to 9,000 mesothelioma claimants, not 15,000.

37.     The simultaneity of these copycat motions cannot be explained by any procedural parallels between this case and *DBMP*. This case has been pending for years, and entails dueling reorganization plans and a motion for estimation that is *sub judice*; *DBMP* has only just been commenced this year, and no plan has been proposed and no motion for estimation has been made.

## INCORPORATION OF ARGUMENTS AND RESERVATION OF RIGHTS

38.     Based on their participation in meet and confer discussions with the Debtor, the Manville Trust and DCPF understand that the ACC and FCR plan to object to the Motion. If their objections, or any other objections, set forth additional reasons why the discovery sought from the Manville Trust and DCPF is irrelevant or otherwise improper, the Manville Trust and DCPF adopt those arguments as if set forth fully herein. The Manville Trust and DCPF also reserve their right to amend or supplement this response and objection based on the Debtor's reply thereto, any changes the Debtor may make to the Proposed Order, or any new facts or developments relating to the Motion. This includes, without limitation, any developments that occur in connection with the parallel Rule 2004 motion in *DBMP*.

## ARGUMENT

39.     The propriety of Rule 2004 discovery is a matter committed to the Court's discretion. *See In re Ramadan*, No. 11-02734-8-SWH, 2012 WL 1230272, at *2 (Bankr. E.D.N.C. Apr. 12, 2012) (citing *McLaughlin v. McPhail*, 707 F.2d 800, 804 (4th. Cir. 1983)). "If

14

a nondebtor is the target of" Rule 2004 discovery and objects, then the movant "must

demonstrate 'good cause'" for such discovery.  9 COLLIER ON BANKR. ¶ 2004.01 (16th ed.).[10]

Generally, good cause is shown if the requested discovery "is necessary to establish the claim of

the party seeking" it or if "denial of such request would cause the examiner undue hardship or

injustice."  *In re SunEdison, Inc.*, 562 B.R. 243, 249 (Bankr. S.D.N.Y. 2017).  The movant

cannot satisfy its burden of showing "good cause" if it seeks Rule 2004 discovery for purposes of

a proceeding that is unauthorized by the court (*e.g.*, an estimation).  *See Eagle-Picher*, 169 B.R.

at 134 (ruling that creditors lacked "good cause" when Rule 2004 discovery was for the purpose

of "developing an alternate plan" while the debtors retained exclusivity).[11]

40.    Rule 2004 inquiries also cannot be used to "invade valid privacy concerns

where otherwise unrelated to the liabilities, . . . rights, actions, and property of the Debtor or

matters otherwise affecting the bankruptcy case."  *In re Yahweh Ctr., Inc.*, No. 16-04306-5-JNC,

2017 WL 327473, at *2 (Bankr. E.D.N.C. Jan. 23, 2017).  Indeed, "even if . . . related to the

debtor or its bankruptcy case, . . . a balancing . . . of the cost and disruptive effect would be in

order, as 'Rule 2004 may not be used . . .to launch into a wholesale investigation of a non-

debtor's private business affairs.'"  *Id.* (quoting *In re Wilcher*, 56 B.R. 428, 434 (Bankr. N.D. Ill.

1985)); *see also In re SunEdison, Inc.*, 572 B.R. 482, 489-90 (Bankr. S.D.N.Y. 2017) ("[T]he

---

[10]  *See also In re Symington*, 209 B.R. 678, 687-88 (Bankr. D. Md. 1997) (recognizing an "implicit" good cause requirement); *In re Eagle-Picher Indus., Inc.*, 169 B.R. 130, 134 (Bankr. S.D. Ohio 1994) ("one seeking to conduct a 2004 examination has the burden of showing good cause for the examination").

[11]  The Debtor asserts that the discovery it seeks is relevant to a possible estimation proceeding.  But the Court has not ordered an estimation, and the use of Rule 2004 to obtain sweeping discovery in aid of a hypothetical estimation is improper.  If the Court orders an estimation, the Debtor's rights to estimation-related discovery (and the Trusts' bases for objecting to such discovery) would be governed by Rule 9014(c), not Rule 2004.  *See, e.g.*, *In re Bennett Funding Grp., Inc.*, 203 B.R. 24, 28 (Bankr. N.D.N.Y. 1996) (ruling that "once . . . [a] contested matter has been commenced, discovery is made pursuant to the FED. R. BANKR. P. 7026 *et seq.*, rather than by a FED. R. BANKR. P. 2004 examination," and collecting cases).

Court must 'balance the competing interests of the parties, weighing the relevance of and necessity of the information sought by examination.'"). To that end, Rule 2004 discovery "may be subject to limitation by [FED. R. CIV. P.] 26(c) and 45(c) . . . 'for good cause shown.'" *Symington*, 209 B.R. at 688-89 (citing 10 COLLIER ON BANKR. ¶ 9016.01 (15th ed. rev.1996)).

## I.

## THE MOTION PRESENTS EXTRAORDINARY PRIVACY CONCERNS

41.     The highly confidential, personal, and commercially sensitive nature of the information demanded by the Debtor, as well as the scale of the disclosure sought, weigh decisively in favor of denying the Motion or, at minimum, restricting the scope of disclosure to information for which Debtor demonstrates a specific need.

### A.     The Debtor Demands the Disclosure of Sensitive Personal Information

42.     Demands for the production of personal, private, financial information require heightened scrutiny. *See Shervin v. Partners Healthcare Sys., Inc.*, No. 1:13MC23, 2013 WL 5655465, at *4 n.2 (M.D.N.C. Oct. 15, 2013) (ruling that "sensitive and inherently confidential" nature of records "justifies greater caution for the Court in exercising its discretion regarding exposing the records to public scrutiny"); *see also In re Glitnir banki hf.*, No. 08-14757 (SMB), 2011 WL 3652764, at *6-7 (Bankr. S.D.N.Y. Aug. 19, 2011) (denying discovery concerning "financial and other private information" unrelated to the property at issue).

43.     The Debtor asserts that it is seeking "non-sensitive" information, Mot. at 21. Not so. The Debtor seeks highly sensitive, personal data concerning 15,000 mesothelioma victims, including: their SSNs, dates of birth, information concerning their asbestos diagnoses, and the SSNs of individuals who may have filed claims on their behalf. Proposed Order ¶ 6. In ruling on the debtors' request for the disclosure of similar data in *Garlock*, the Honorable J. Craig Whitley observed:

16

We're talking about ***inherently sensitive information*** in these databases that relate to third parties, the trust claimants. That includes personal identifiers, medical information . . . and dissemination improperly could do harm to those people in a variety of ways, ranging from identity theft to, effectively, misuse in the tort system by other defendants.[12]

Courts routinely agree that data of the sort demanded by the Debtor are sensitive and merit special protection. *See, e.g.*, *U.S. Equal. Emp. Opportunity Comm'n v. McCormick & Schmick's Seafood Rests.*, No. DKC-11-2695, 2012 WL 2577795, at *3 (D. Md. July 2, 2012) (denying disclosure of SSNs, despite confidentiality order, because they "are private and should only be released on a showing of relevancy and true need").[13]

   44. The Debtor suggests that the data at issue are not confidential because the Manville Trust once sold such data (with strict confidentiality protections that the Debtor neglects to mention), *see* Mot. at 22. But the Debtor's characterization of this 18-year-old arrangement is egregiously misleading. *Supra* at 28-31. Further, the Manville Trust's alleged long-past practices are irrelevant in today's more challenging environment of data security

---

[12] Transcript of Ruling on: (4599) Debtors' Motion for Leave to Serve Subpoena on Manville Trust and Objections, Responses, and Replies Thereto, June 30, 2015 (the "**Manville Trust Ruling**" (Haggerty Decl., Ex. A)), at 6:17-24.

[13] *See also Entral Group Int'l, LLC v. YHCL Vision Corp.*, 436 F. Supp. 2d 404, 405 (E.D.N.Y. 2006) (recognizing "significant privacy interests at stake" with the disclosure of SSNs and that the "low threshold normally applicable to justify discovery is insufficient to address the invasion of privacy which disclosure of the SSNs threatens"); *Nw. Mem. Hosp. v. Ashcroft*, 362 F.3d 923, 927-29 (7th Cir. 2004) (quashing subpoena seeking medical records, noting the "natural sensitivity that people feel about the disclosure of their medical records" and the risk of "potential loss of privacy that would ensue were these medical records used in a case in which the patient was not a party") (citation and internal quotation marks omitted); *Singletary v. Sterling Transp. Co.*, 289 F.R.D. 237, 241 (E.D. Va. 2012) (barring disclosure of medical, payroll, and income tax information, SSNs, information about family members, and "other documents completely extraneous to this litigation"); *U.S. Equal Emp. Opportunity Comm'n v. SleeveCo, Inc.*, No. 2:08-CV-00106-SSC, 2008 WL 11334159, at *9 (N.D. Ga. Dec. 8, 2008) (barring disclosure of individual's "private" information, including her SSN, address, telephone number, information about her family or "any similar . . . personal information"); *State v. DeFusco*, 620 A.2d 746, 753 n.19 (Conn. 1993) ("Medical information or products, financial documents and personal letters are among those items we think it is reasonable for [individuals] to wish to maintain as confidential.").

threats. They are also irrelevant to evaluating the confidentiality of the DCPF Trusts' data. The Manville Trust has no legal relationship with any of the DCPF Trusts.

45.     The Debtor's contention that the data it seeks are "non-sensitive" is also belied by the admission of its expert, Bates White. In March 2002 and again in June 2004, long before data security and data privacy became vital policy concerns, Bates White acknowledged that the copy of the database extract it received from the Manville Trust "has proprietary value to the CRMC"—the claims processor owned by the Manville Trust—and "includes confidential medical and other information regarding individual Manville Trust claimants." Garelick Decl. Exs. C & D.

46.     In fixing the proper scope of disclosure, courts are "required to apply the balancing standards: relevance, need, confidentiality and harm." *Insulate Am. v. Masco Corp.*, 227 F.R.D. 427, 432 (W.D.N.C. 2005). "Even if the information sought is relevant, discovery is not allowed where no need is shown, or where compliance is unduly burdensome, or where the potential harm caused by production outweighs the benefit." *Id.* Here, relevance and privacy interests are not in balance: the Debtor lacks a valid use for claimants' PII, *infra* Pt. II. The Court should deny the Motion or restrict disclosure accordingly.

**B.     The Debtor Seeks Proprietary and Commercially Sensitive Information**

47.     The Debtor's disclosure demands should also be denied, or at least sharply narrowed, because it seeks commercially sensitive information in which the Trusts have a proprietary interest. *See* FED. R. CIV. P. 45(d)(3)(B)(i) (permitting court to quash or modify a subpoena if it requires "disclosing . . . confidential . . . commercial information"). Where, as here, confidential commercial information is being sought, and the party that owns that information has sought to safeguard its confidentiality, "the burden is on the party seeking discovery to establish that the information is sufficiently relevant and necessary to his case to

outweigh the harm disclosure would cause to the person from whom he is seeking the information." Wright, Miller, et al., 8A FED. PRAC. & PROC. Civ. § 2043 (3d ed.). The Debtor has not satisfied this burden.

48. Courts construe "confidential . . . commercial information" to encompass business records that the discovery target "maintains in confidence and does not publicly disclose." *In re Subpoena of DJO, LLC*, 295 F.R.D. 494, 498 (S.D. Cal. 2014) (citation and internal quotation marks omitted). The information sought by the Debtor easily qualifies as confidential and commercial. *See* Manville Trust Ruling at 7:3-5 ("[T]he database, obviously, is proprietary information of the Trust, which has invested considerable time and resources and has a commercial interest."). The databases created and maintained by the Trusts at significant expense, in some cases over decades, contain granular detail about hundreds of thousands of individual asbestos victims, their health, their finances, and the like. *See, e.g.*, Garelick Decl. ¶ 30. The Trusts' datasets have significant commercial value, particularly to experts and insurers in the business of pricing asbestos liability, who would otherwise need to devote significant resources to gathering the data assembled by the Trusts.[14] It is for this reason that Bates White used to pay the Manville Trust (and agree to onerous use and confidentiality strictures, backed by the agreed-upon remedy of injunctive relief) to access its data. It is also why Bates White acknowledged that the Manville Trust's data have "proprietary value." *Supra* ¶ 31.

49. Because opening their databases to commercial exploitation would conflict with their duties to individual asbestos victims, the Manville Trust and DCPF do not

---

[14] To illustrate, the leaders of Bates White used to run a side business, the Litigation Resolution Group ("**LRG**"), which they marketed as a private alternative to 524(g) trusts. For a price, LRG would assume the asbestos liabilities of companies that chose to remain in the tort system. Haggerty Decl. Ex. B. Access to the Trusts' data would enable a business like LRG to more accurately quantify and price companies' expected asbestos liabilities—and would therefore be hugely valuable.

grant access to their claims data to all comers.  This is especially true of bulk disclosures of the

sort sought by the Debtor.  Such disclosures would erode claimants' faith in the Trusts, deter

claimants from providing the Manville Trust and DCPF with the sensitive information they need

to evaluate claims, and thereby compromise the claims resolution process.  *Infra* Pt. III.  Further,

claims processing facilities such as DCPF compete with one another and with other market

entrants to process claims for Section 524(g) trusts and other settlement funds.  The mass

turnover of claimant information by DCPF—even if Court-ordered—could brand it as an unfit

custodian of such information and interfere with its business operations.  *See* Winner Decl. ¶ 7.

50.    Accordingly, the Court should deny the Motion or limit disclosure to

anonymized data for which the Debtor can demonstrate a need.

**C.    The Debtor's Plans to Aggregate Claimant Data Raise the Privacy
and Confidentiality Stakes, and Support Restricting the Scope, of Disclosure**

51.    The Debtor's demands raise "big data" concerns that most subpoenas do

not because it plans to combine the data produced by the Trusts, including PII and other private

information, for 15,000 mesothelioma victims into a consolidated database along with data

gleaned from other sources.  "[T]he compilation of otherwise hard-to-obtain information alters

the privacy interest implicated by disclosure of that information," and a "computerized summary

located in a single clearinghouse of information" warrants particular scrutiny.  *U.S. Dep't of

Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 763-64 (1989).

52.    Indeed, aggregations of even public data present unique privacy and

security concerns because the "unrestrained power to assemble data that reveal private aspects of

identity is susceptible to abuse."[15]  *United States v. Jones*, 565 U.S. 400, 416 (2012) (Sotomayor,

---

[15]  *See also Frost v. Perry*, 161 F.R.D. 434, 436 (D. Nev. 1995) (denying motion to compel disclosure of
unclassified project names associated with confidential site, reasoning that "the *combination* of

J., concurring); *see also U.S. Dep't of Defense v. Fed. Labor Relations Auth.*, 510 U.S. 487, 500

(1994) ("An individual's interest in controlling the dissemination of information regarding

personal matters does not dissolve simply because that information may be available to the

public in some form."); *Havemann v. Colvin*, 537 F. App'x 142, 147-48 (4th Cir. 2013)

(recognizing privacy interest in nondisclosure of information, even if otherwise public, in a

format that could be combined with other available data to identify specific individuals).

53.     The Debtor's designs implicate all of these concerns.  It intends to take

extraordinarily sensitive claims files that relate to 15,000 mesothelioma victims, and that are

separately maintained by 11 asbestos trusts and pool them into a single database.  There is an

acute risk that such a merged database, once created, could be used in a manner detrimental to

the privacy interests of individual claimants, particularly if it is misappropriated or inadvertently

disclosed (*e.g.*, because of a data breach).

54.     The Debtor tries to minimize this risk by citing Bates White's history

working with information that is "highly sensitive," as well as its claimed use of "best practices

for data confidentiality and protection."  Declaration of Charles Bates, dated July 30, 2020 [Dkt.

No. 1238-2] ("**Bates Decl.**"), ¶ 25.  The Debtor ignores that (i) its Proposed Order actually

violates the "best practices" that Bates White claims to follow, *see infra* ¶¶ 84-85, (ii) even the

most secure platforms can be hacked, and (iii) its Proposed Order would allow scores of

people—not just Bates White—access to the Trusts' data (or the merged database incorporating

those data) regardless of their need for such access.  The more people who have access to this

sensitive data, the more it is at risk of inadvertent or malicious disclosure.

---

unclassified items of information provides an added factor that warrants protection of the information
taken as a whole") (emphasis added).

55.     The Debtor's assertions about its experts' data security measures also miss the larger point.  Centralizing confidential data from 11 dispersed sources into a single database (regardless of the security measures) creates a powerful analytic tool that may be abused to discern patterns and reveal insights about individual claimants on subjects unrelated to this case.  Further, the creation of a combined database puts more claimant data (both in terms of the number of claimants and the amount of data for each claimant) at risk of inadvertent disclosure or misappropriation, and amplifies the potential consequences of even a single data breach.  The theft of just a single file could compromise personal data concerning 15,000 people.[16]

56.     The only way to mitigate this risk—and to avoid having this case function as a clearinghouse for sensitive, personal data—is to restrict the data that the Debtor can collect and combine.  Specifically, the Court should order that any data produced by the Trusts be anonymized.  The Debtor does not need claimants' PII to estimate its mesothelioma liability or detect inconsistent claims filings.  *See infra* Pt. II.B.

57.     The Debtor argues that the requested discovery has been "designed" to "protect[] claimants' information," Mot. at 10.  But the Proposed Order's confidentiality and use provisions are deficient and would do almost nothing to protect the legitimate expectations of asbestos victims that the private information they submit to the Trusts will stay confidential.  *Infra* Pt. IV.  Further, absent anonymization, tightening those restrictions would be cold comfort.  One of the lessons of *Garlock* is that confidentiality restrictions and sealing requirements

---

[16]  In recent years, many governments and organizations have recognized that the aggregation, storage, dissemination, use, and potential misuse of PII present extraordinary risks that must be carefully managed.  For example, the U.S. Agency for International Development ("**USAID**") recommends that its staff and partners use "de-identification" where possible, and also "collect the minimum possible amount of sensitive information, limit the extent to which these data are copied or moved, and delete them once you no longer need them."  *See* "Considerations for Using Data Responsibly at USAID," USAID (May 1, 2019), *available at* https://www.usaid.gov/responsibledata (last accessed Aug. 12, 2020).

intended to protect claimants' privacy can (and will) be circumvented.[17]  The only way to

prevent the improper use or disclosure of claimant data is to anonymize it.  *See infra* Pt. II.B.

## II.

### THE DEBTOR LACKS A LEGITIMATE NEED FOR DATA FOR 15,000 MESOTHELIOMA VICTIMS OR PII FOR ANY OF THEM

58.     Whether disclosure "imposes an undue burden depends on 'such factors as

relevance, *the need of the party for the documents*, the breadth of the document request . . . and

the burden imposed.'"  *Hughes v. Twenty-First Century Fox, Inc.*, 327 F.R.D. 55, 57 (S.D.N.Y.

2018) (internal citation omitted; emphasis added); *see also United States v. Meridian Senior*

*Living, LLC*, 5:16-CV-410-BO, 2018 WL 5723930, at *4 (E.D.N.C. Nov. 1, 2018) (same).  As

we expect the ACC and FCR to demonstrate in their objections to the Motion, the discovery

sought by the Debtor is unnecessary, irrelevant, and, at best, premature.  Even if that were not so,

relevance alone does not support nonparty discovery when the party seeking such disclosure

lacks a legitimate need for it.  *See Insulate Am.*, 227 F.R.D. at 432.[18]  Here, the Debtor has failed

to show that it needs information for 15,000 individuals (as opposed to a sample) or that it needs

PII for any individual claimants.

---

[17]  During *Garlock*, the MADISON-ST. CLAIR RECORD published an article that detailed the amounts that
certain mesothelioma claimants had received from all sources and gratuitously identified each individual
claimant by name.  The article relied on information produced to the Garlock debtors that had been filed
with this Court under seal.  *See* Heather Isringhausen Gvillo, *Database provides insight into how much
asbestos claims are worth*, MADISON-ST. CLAIR RECORD, May 14, 2015,
http://madisonrecord.com/issues/302-asbestos/270770-database-provides-insight-into-how-much-
asbestos-claims-are-worth (Haggerty Decl. Ex. C).

[18]  *See also Goard v. Crown Auto, Inc.*, 6:15-CV-35, 2017 WL 6381703, at *2 (W.D. Va. Jan. 5, 2017)
("[E]ven if the information sought is relevant, discovery is not allowed where no need is shown, or where
compliance is unduly burdensome . . . .'").

## A.     Any Production Should Be Limited to a Sample

59.     The Debtor has failed to explain how exactly it intends to use the Trusts' data for 15,000 mesothelioma victims, and it is clear that the Debtor's request for disclosure about all of these individuals is misaligned with the inquiry it purportedly plans to undertake. The Debtor states that it is seeking discovery to determine whether there was a "pattern" of false claims submissions to it or its predecessor, and whether any such pattern "was prevalent."  Mot. at 2, 7.  The Debtor does not need data on 15,000 individuals or to undertake a claimant-by-claimant slog through each of their claims records to determine if such a pattern exists, and the Manville Trust and DCPF expect that any individualized analysis that the Debtor conducts will be limited to a subset of this population.

60.     The Debtor's approach is therefore disproportionate on its face, and the Court should reject it.  Any production should be based on a statistically significant sample of the 15,000 victims at issue.  Although a few hundred would likely suffice, the Manville Trust and DCPF would be amenable to producing data for a random sample of up to 10% of the 15,000 claimants to dispel any concerns the Debtor might have about drawing a representative sample.

61.     Sampling along these lines is a widely accepted.  "In some cases that involve a massive number of claims . . . sampling techniques can streamline discovery . . . ." MANUAL FOR COMPLEX LITIG. § 22.81 (4th ed. 2020).  For this reason, courts routinely encourage sampling.  For instance, in a case involving "322 opt-in Plaintiffs and one of the nation's largest health insurance companies," the court actively "promot[ed] sampling of e-discovery, not solely for testing, but as an overarching solution for proportional discovery." *Ruggles v. WellPoint, Inc.*, Civ. No. 1:08-CV-201 (LEK/RFT), 2010 WL 11570681, at *1, 9 (N.D.N.Y. Dec. 28, 2010).  And in litigation stemming from losses in the mortgage markets, courts routinely adopted sampling to streamline discovery involving millions of loan files.  *See,*

*e.g.*, *Fed. Hous. Fin. Agency v. JPMorgan Chase & Co.*, Civ. No. 11-CV-6188 (Consol.), 2012
WL 6000885, at *5, 7-10 (S.D.N.Y. Dec. 3, 2012) (approving sampling as a method to establish
liability for fraud, with a sample of 42,700 out of 1.1 million mortgage loans). Indeed, the
Debtor's own expert has confirmed the utility of sampling to "offer[] a scientifically reliable and
cost-effective approach to learning about entire populations from a more manageable subset,"
and advertises its "significant experience . . . designing samples and developing data collection
protocols to draw statistically valid conclusions . . . in . . . litigation settings."[19]

       62.     The Debtor notes the unremarkable fact that "[m]any courts . . . have
recognized that discovery from trusts is proper when they possess" relevant evidence, Mot. at 23,
but ignores that courts, including this one, have also embraced sampling in asbestos-related
litigation. Thus, in *Garlock*, the Court adopted an estimation approach (urged by the debtors)
that was based on questionnaire responses from a "sizeable sample of the current claimants"—
even where claimant responses "were far from complete." 504 B.R. 71, 95 (Bankr. W.D.N.C.
2014). And in *National Union Fire Ins. Co. of Pittsburgh v. Porter Hayden Co.*, a case upon
which the Debtor relies, Mot. at 12, the court limited disclosure to a random sample of 10% of
the claimants at issue and omitted confidential claimant information including addresses, SSNs,
dependent names, and birth years. Civ. No. CCB-03-3408, 2012 WL 628493, at *1 (D. Md. Feb.
24, 2012).[20]

---

[19] *See* Bates White Economic Consulting, "Data Science and Statistics," *available at*
https://www.bateswhite.com/practices-Data-Science-and-Statistics.html#Overview (last accessed Aug.
12, 2020).

[20] The Debtor also relies on a 2009 decision issued by a special master in a Delaware state court litigation
between an insurer and its insured. *See Congoleum Corp. v. ACE Am. Ins. Co.*, Misc. No. 09M-01-084
(Del. Super. Ct. Aug. 4, 2009) (cited at Mot. at 12). But the special master in *Congoleum* does not appear
to have considered—much less rejected—sampling or anonymization.

63. Here, there is no reason for the Debtor to oppose a production based on sampling. A randomly selected, sampling-based production of data concerning a few hundred (or up to 1,500) mesothelioma victims would suffice for the analysis that the Debtor says it wants to complete, and comport with the standards of scientific reliability that courts require when evaluating sampling evidence. Accordingly, the Court should deny the Motion or modify the Proposed Order to limit any disclosure by the Trusts to a sample.

**B.      Because the Debtor Has No Need for Claimants' PII,
Any Production Should Be Made on an Anonymized Basis**

64. The Debtor seeks the disclosure of PII (claimants' names, SSNs, and dates of birth) that has no bearing on determining the extent to which claimants made inconsistent claims filings and no utility in valuing the Debtors' aggregate mesothelioma liability. Because the Debtor offers no explanation—and none exists—for why it needs such PII, or how such PII would enable it to identify inconsistent claim activity, any disclosure herein should be anonymized—*i.e.*, stripped of PII—pre-production. *See SunEdison*, 572 B.R. at 491 (denying Rule 2004 discovery where the debtors "failed to demonstrate that the discovery they seek is needed to accomplish the purposes they have identified"). Pre-production anonymization would not frustrate the Debtor's use of the produced data, but it would offer common sense protection commensurate with the sensitivity of the data.

65. The Motion itself confirms that pre-production anonymization would not impair the Debtor's ability to make arguments about inconsistent claim filings. Admitting that claimants' "identities are not immediately relevant," the Debtor pseudonymizes the claimants whom it accuses of filing inconsistent claims. Mot. at 14-19 & n.15 (referring to them by generic names such as "Plaintiff A" and redacting identifying information about them and their law firms). The Debtor denies that identifying information about these claimants is confidential,

26

*id.* at n.8.  But the "confidentiality" of PII is a separate question from whether the Debtor needs

such information to advance its intended arguments.  It obviously does not.

       66.    Pre-production anonymization is not an exotic concept.  The partial or

complete elimination of claimant PII has featured in negotiated productions by asbestos trusts for

some time.  *See Fed.-Mogul Prods., Inc. v. AIG Casualty Co.*, No. MRS-L-2535-06 (N.J. Sup.

Ct. Report & Recommendation of Special Discovery Master, dated July 20, 2011), at 36-37

(anonymizing claimant names and other information) (Haggerty Decl. Ex. D); *Nat'l Union Fire*

*Ins. Co. of Pittsburgh, PA v. Porter Hayden Co.*, No. 03-cv-3408-CCB (D. Md. Stipulated

Protective Order, filed Apr. 19, 2011 and entered Apr. 20, 2011), ¶ 8 (ordering disclosure of

claimant names but allowing claims processor to withhold, *inter alia*, claimants' SSNs and

contact information, names of personal representatives, and dependent names) (Haggerty Decl.

Ex. E); *Porter Hayden Co.*, 2012 WL 628493, at *1 (same).

       67.    The Debtor maintains that pre-production anonymization would be

unworkable, but its position does not hold up to scrutiny.  The Debtor argues that, with pre-

production anonymization, it will not be able to merge the data produced by the Trusts with the

data it already has, which would thwart its efforts to identify inconsistent claim filings.  Haggerty

Decl. ¶¶ 5-6.  The Manville Trust and DCPF have offered, and the Debtor has rejected, a

solution:  the Manville Trust and DCPF and the Debtor jointly engage a nonparty unconnected

with asbestos-related litigation (*e.g.*, the consulting arm of a large accounting firm) to merge the

Trusts' data with the Debtor's (we refer to this process as "third-party anonymization").  After

synching the datasets, the third party would anonymize the merged database and make it

available to the Debtor.  *Id.*

68. Given the massive number of claimant records sought by Debtor, and their sensitivity, the need for pre-production anonymization here is acute. No matter how strict, a protective order will not shield a dataset containing PII from misuse, whether intended, inadvertent, or as the result of a data breach. Scrubbing PII (which the Debtor does not need) from any production will dramatically limit the dangers that attend the disclosure of such data, without impairing the Debtor's use of it. Accordingly, if the Court is inclined to grant Rule 2004 disclosure, it should order pre-production anonymization.

69. Even if the Court were to conclude that the Debtor needs PII for matching (and rejects third-party anonymization), the Debtor does not need PII to use the merged dataset to identify inconsistent claims submissions or to value its mesothelioma liability. Accordingly, if the Debtor conducts the matching process itself, the Court should order it, after completing that process, to (i) anonymize the matched data, (ii) place the anonymized data in a segregated database, (iii) secure that database and not place it in the public record; and (iv) delete it at the end of this case. The Hon. Robert E. Gerber endorsed exactly this approach in connection with an estimation in *In re Motors Liquidation Co.*, Ch. 11 Case No. 09-50026 (REG) (Bankr. S.D.N.Y. Oct. 22, 2010) [Dkt. No. 7526] (Haggerty Decl. Ex. F), one of the cases the Debtor cites as confirming the propriety of the requested discovery. *See* Mot. at 23 & n.51.

70. The Debtor also fails to disclose that this Court ordered this same approach to anonymization in *Garlock*. Nor does it explain why the Proposed Order jettisons this approach. In its Order Granting in Part and Denying in Part Debtors' Motion for Leave to Serve Subpoena on Manville Trust, dated July 24, 2015 (Haggerty Decl. Ex. G (the "***Garlock Anonymization Order***"))—an order discussed at length (but without mention of its anonymization provisions) by the Debtor, *see* Mot. at 22—the Court ordered the *Garlock* debtors

28

to anonymize the Manville Trust's data after Bates White used claimants' PII to identify and delete records for claimants who did not have pending claims against the debtors (referred to as "Non-Matching Claimants"). Subject to four narrow exceptions, the debtors and Bates White were then restricted to using an anonymized database containing data only for claimants with pending claims against the *Garlock* debtors. Garlock Anonymization Order ¶¶ 5-8; *see also* Manville Trust Ruling at 7:22-8:5 (ordering debtors to "anonymize the information" produced by the Manville Trust *after* "cull[ing] . . . out" the records for non-*Garlock* claimants).

71.     Judge Whitley was unequivocal that the anonymization process that he was ordering should follow the contours of the *Motors Liquidation* protocol:

> I want the remainder [*i.e.*, the claims data remaining after culling out the non-*Garlock* claimants] . . . to be anonymized, similar to what Judge Gerber ordered . . . , effectively segregating that information in the database using it for present purposes only, the estimation hearing and the confirmation proceeding. . . . I want claimant identifiable information deleted. . . . You can almost follow Page 6 of Judge Gerber's order. . . .

Manville Trust Ruling at 8:6-15.

72.     Judge Whitley was also unequivocal that he was ordering anonymization because of problems that arose in the mesothelioma estimation proceedings in *Garlock*, "when the information was all in the record and . . . the sealing orders were under . . . successful assault," *id.* at 7:10-13. He emphasized that he did not "want claimants' specific data filed in the public record . . . or filed with the court," and that absent anonymization, "I don't think we have an ability to protect that information." *Id.* at 8:23-25. Finally, Judge Whitley indicated that his ruling was informed by recent experience with data breaches: "the Federal Government does not even have the ability to protect its own employees' information from hacking." *Id.* at 9:13-15.

73.     The concerns animating the anonymization ruling in *Garlock* apply here, and with greater force: since the Manville Trust Ruling in 2015, the incidence of data breaches

and awareness of the dangers posed by such breaches has been rocketing upward.[21]

Accordingly, the Court should order that any data produced by the Trusts be anonymized pre-production or, at minimum, adopt *Garlock*'s post-production anonymization approach. The Court should also bar the Debtor from re-associating claimant PII with the anonymized data.

## C.     The Debtor Does Not Need Most of the Datafields It Seeks

74.     In addition to seeking PII it does not need, the Debtor seeks the disclosure of 18 other datafields. Proposed Order ¶ 6. But it fails to explain how any of these datafields might assist Bates White in detecting patterns of inconsistent claims filing or in valuing the Debtors' mesothelioma liability. It is clear that many of the datafields would have no such utility, including data concerning claimants' dates of death, states of residency, genders, and law firms. Data concerning the status of claimants' claims against the Trusts (*e.g.*, the date claims were paid or approved) and the "mode of review (*i.e.*, whether the claimant sought expedited or individual claim review) are also irrelevant to whether such claimants made inconsistent claims submissions and will not facilitate the valuation of the Debtor's mesothelioma liability. The Court should deny the Debtor's request for the production of such irrelevant data.

## D.     The Debtor's Requested Discovery Will Implicate
Asbestos Victims With No Connection to this Case

75.     The Debtor has assured the Court that, because it intends to provide the Manville Trust and DCPF with SSNs for the 15,000 mesothelioma victims about whom it seeks discovery, the "Trusts can conduct a quick and *error-free matching process*." Mot. at 3 (emphasis added). The Debtor is incorrect.

---

[21] For example, the U.S. Department of Health and Human Services ("**HHS**"), which tracks breaches of healthcare records affecting 500 or more people, reports that the number of such data breaches has increased each year since 2015, with almost *twice* as many such breaches in 2019 as in 2015. *See* Breach Portal, HHS, available at: https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf (last accessed Aug. 13, 2020); *see also* Haggerty Decl. ¶ 22 (summarizing relevant HHS data breach statistics).

76.     The Manville Trust and DCPF cannot rely on SSNs alone to conclusively
identify claims data for the 15,000 individuals at issue because some of them undoubtedly gave
Bestwall or the Trusts incorrect SSNs when submitting their claims.  In the ordinary course of
business, the Manville Trust and DCPF never rely on claimants' SSNs alone to identify claims
files because claimants' submissions sometimes include transposition errors, and the
extraordinary number of records in the Trusts' databases (the Manville Trust database alone has
data for over 1 million individuals) makes misidentification probable.  *See* Garelick Decl. ¶¶ 30-
32; Winner Decl. ¶¶ 24-25.  As a result, using SSNs alone to identify claims data in connection
with Rule 2004 discovery will result in the Manville Trust and DCPF producing data for
individuals who are strangers to the Debtor—data that are *per se* irrelevant to any issue in this
case.  Any argument to the contrary is undercut by Bates White's acknowledgment that it will
require claimants' "name *and* SSN" to "identify[] claimants across the multiple sources of
asbestos claims information available in this matter."  Bates Decl. Ex. A ¶ 15 (emphasis added).

77.     To be clear, the Manville Trust and DCPF could use SSNs to reliably
identify claims data for the mesothelioma victims at issue, but only if accompanied by other
identifying information that the Debtor could provide (*e.g.*, claimant names or dates of birth).
They so informed the Debtor, and the Debtor claimed that it would "work" to resolve this
concern, but the Proposed Order still includes the Debtor's flawed matching process.  Haggerty
Decl. ¶¶ 7-8.  If it is inclined to grant the Motion, the Court should modify the Proposed Order to
require that the Manville Trust and DCPF produce data only for claimants identified by SSN *and*
an additional datafield (such as name or date of birth) so that it can be assured that any data that
are produced correspond to an actual Bestwall claimant.

31

# III.

## COMPLIANCE WITH THE SUBPOENAS WOULD IMPAIR CLAIMANTS' FAITH IN THE MANVILLE TRUST AND DCPF

78.     The Debtor ignores a distinct burden that its demands would place on the

Manville Trust and DCPF—the erosion of trust that will result from their disclosure of private

claims data.  Courts routinely decline to compel the disclosure of private information where, as

here, such disclosure would impair the discovery target's commercial relationships.  In 2006,

when the U.S. government subpoenaed Google's entire database of URLs from its search index,

as well as individuals' search queries, Google objected because it would "be unduly burdened by

loss of user trust if forced to produce its users' queries to the Government."  *Gonzales v. Google,*

*Inc.*, 234 F.R.D. 674, 679, 683 (N.D. Cal. 2006).  It successfully argued that:

> [A] perception that Google is acquiescing to the Government's
> demands to release its query log would harm Google's business by
> deterring some searches by some users . . . The expectation of
> privacy by some Google users may not be reasonable, but may
> nonetheless have an appreciable impact on the way in which
> Google is perceived, and consequently the frequency with which
> users use Google.  Such an expectation . . . indicate[s] that there is
> a potential burden as to Google's loss of goodwill if Google is
> forced to disclose search queries to the Government.

*Id.* at 683-84.  *See also Shervin*, 2013 WL 5655465, at *4 (declining to compel surgery board "to

disclose documents it obtained under a promise of confidentiality" when doing so "would likely

adversely affect the willingness of peers to provide such information" and undermine the board's

"ability to fulfill its mission to protect the public").

79.     The same concern weighs against disclosure here.  Asbestos victims

volunteer their most sensitive personal and medical information to the Trusts in the expectation

that it will be kept private.  Further, the Trusts need this information to discharge their court-

ordered mandates to provide a uniform and efficient "process for fairly determining the rights of

all Beneficiaries," while reducing their processing fees to "conserve and enhance Trust assets for distribution to Beneficiaries . . . ."[22]

80.    The Manville Trust and DCPF "do[] not share this information with third parties," and they have implemented "security procedures to maintain [its] confidentiality." *Gonzales*, 234 F.R.D. at 684.  The mass production of such information to an asbestos debtor (and an expert firm that is routinely adverse to the interests of asbestos victims), which intends to commingle the data in a centralized database, would upend claimants' expectations.

81.    The claims resolution process requires the free exchange of information between claimants and the Trusts.  The disclosure sought by the Debtor would likely create a "chilling effect" that would deter claimants from revealing their most private information to the Trusts.  *See* Garelick Decl. ¶¶ 5-6; Winner Decl. ¶¶ 6-7.  This burden militates against the indiscriminate disclosure demanded by the Debtor.

## IV.

### THE PROPOSED ORDER'S USE AND CONFIDENTIALITY PROVISIONS ARE UNSUITED TO THE SENSITIVITY OF THE TRUSTS' DATA

82.    The Proposed Order's use, confidentiality, and data retention provisions provide insufficient protection to the Trusts' data.

83.    *First*, the Debtor purportedly seeks to use the Trusts' data in connection with the "negotiation, solicitation, and confirmation of a plan," Proposed Order ¶ 2, but does not commit to using the data only for this purpose.  The Proposed Order contemplates the general use of the Trusts' data "in connection with this bankruptcy case."  *Id.* ¶ 7(g).  The Manville Trust

---

[22] *In re Joint E. & S. Districts Asbestos Litig.*, 878 F. Supp. 473, 570 (E.D.N.Y. 1995), *aff'd sub nom. In re Joint E. & S. Dist. Asbestos Litig.*, 100 F.3d 944 (2d Cir. 1996) (further subsequent history omitted).

and DCPF requested that the Debtor agree to stricter use limitations; the Debtor declined.
Haggerty Decl. ¶ 9.

84.    *Second*, the Proposed Order would provide the Debtor, ACC, the FCR, and Georgia-Pacific LLC (together with the ACC and FCR, the "**Parties**") *and* "their employees or members who are personally performing work with respect to this bankruptcy case" access to the Trusts' data *without regard to whether they need such access*.  Proposed Order ¶ 7(a).  It also would grant such access to any employees or agents or representatives of the Parties' law firms and experts "who are personally involved in rendering services in connection with this bankruptcy case"—again, without regard to need.  *Id.*  Scores of professionals should not receive access to sensitive data about 15,000 mesothelioma victims merely because they are "performing work" in this case.  Access to the Trusts' data and any merged dataset containing such data should be restricted to professionals with a demonstrated "need to know."

85.    Bates White has confirmed that the data access restrictions sought by the Manville Trust and DCPF—including "need to know" and "least privilege"[23] restrictions—are "industry best practice," and even touts that they are among its routine data security measures. Bates Decl. ¶ 25.  But, inexplicably, the Debtor rejected these limitations, Haggerty Decl. ¶ 10, even while stipulating to far more stringent restrictions on its own claims data (including for the same claimants about whom it seeks disclosure), stored in the "Asbestos Claims Database."[24]

---

[23] "Least privilege" restrictions require that users have the minimum access sufficient to accomplish their task.  This typically includes limits on the scope of accessible data, and the duration of access (*i.e.*, access rights should be withdrawn immediately after the task is complete).  *See generally* U.S. Cybersecurity & Infrastructure Security Agency, "Least Privilege" (rev. May 10, 2013), *available at* https://us-cert.cisa.gov/bsi/articles/knowledge/principles/least-privilege.

[24] Section A.3 of the Agreed Protective Order Governing Confidential Information [Dkt. No. 337] (the "**Protective Order**") describes the "Asbestos Claims Database" as "the database containing the historical asbestos claims data of the Debtor and its predecessors, including any reports, summaries, data, information, or extracts derived therefrom, that is maintained by the Debtor."

That database is subject to "professionals eyes only" restrictions and access to it is limited to a

short list of attorneys and experts (*i.e.*, not anyone "performing work with respect to this

bankruptcy case"). Protective Order § J.

86. *Third*, the Proposed Order would allow the Debtor to maintain copies of

the Trusts' productions (referred to in the Proposed Order as the "**Matched Production**") for up

to a year "after the date of substantial consummation of a confirmed chapter 11 plan," Proposed

Order § 9, which could be construed as the date *decades* from now on which the last Bestwall

personal injury claimant is paid by a Bestwall 524(g) trust. Because the Debtor is purportedly

seeking discovery in connection with the plan process, the Manville Trust and DCPF urged the

Debtor to agree to delete their productions within 1 month of the entry of a final order

confirming a Chapter 11 plan. They noted that this Court imposed this deadline in *Garlock*.

*Garlock* Anonymization Order § 15. The Debtor rejected this request. Haggerty Decl. ¶¶ 12-13.

87. The Debtor has given no justification for why it needs such a blank check

to use the Trusts' data (or databases compiled from such data) and none exists. If the Court does

not deny the Motion outright, it should modify the Proposed Order to limit the Parties' use of the

Trusts' data to issues directly relating to plan confirmation and the valuation of the Debtor's

mesothelioma liability, make such data available only to professionals with a demonstrated

"need to know" and only for the time period that they require such access, and order the deletion

of such data within one month of the entry of a final order confirming a Chapter 11 plan.

## CONCLUSION

88. For the foregoing reasons, the Manville Trust and DCPF respectfully

request that this Court deny the Motion.

89. If the Court is not inclined to deny the Motion in its entirety, the Manville

Trust and DCPF respectfully request that this Court modify the Proposed Order by:

a.       Limiting the production of data to a random sample of no more than 10% of the 15,000 mesothelioma victims at issue;

b.       Authorizing the Manville Trust and DCPF, or a neutral third party, to anonymize the Trusts' claims data before producing it or, at minimum, requiring the Debtor and its experts to anonymize such data after it is produced, and barring the Debtor from re-associating claimant PII with the anonymized data;

c.       Limiting any disclosure to data concerning:  the date of diagnosis of the injured party; the claimed disease and disease body site (if available); the date of claim filing against each Trust; and all exposure-related data fields (if available), including date(s) exposure(s) began, date(s) exposure(s) ended, manner of exposure, occupation and industry when exposed; and products to which the claimant was exposed;

d.       Defining a "matching claimant" as an individual with the (i) same SSN and (ii) date of birth or first name, last name pairing;

e.       Limiting the use of the Trusts' data to issues directly relating to plan confirmation and the valuation of the Debtor's mesothelioma liability;

f.       Denying access to such data to professionals without a demonstrated need for such access at the time they have such access; and

g.       Requiring the deletion of the Trusts' data and all datasets derived therefrom (including the Merged Database or any extracts of the Merged Database) within one month of the entry of a final order confirming a Chapter 11 plan.

*[Signature Page Follows]*

36

Dated:   Charlotte, North Carolina
         September 4, 2020

Respectfully submitted,

WOMBLE BOND DICKINSON (US) LLP

s/ B. Chad Ewing
B. Chad Ewing (N.C. Bar No. 27811)
One Wells Fargo Center, Suite 3500
301 South College Street
Charlotte, North Carolina  28202
(704) 331-4996

-and-

FRIEDMAN KAPLAN SEILER
   & ADELMAN LLP
Jason C. Rubinstein (admitted *pro hac vice*)
Timothy M. Haggerty (admitted *pro hac vice*)
Michael S. Palmieri (admitted *pro hac vice*)
7 Times Square
New York, New York  10036-6516
(212) 833-1100

*Attorneys for Nonparties*
*Manville Personal Injury Settlement Trust and*
*Delaware Claims Processing Facility*