# EXHIBIT F

## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

In re

BESTWALL LLC,[1]

          Debtor.

Chapter 11

Case No. 17-31795 (LTB)

## <u>DECLARATION OF CHARLES E. BATES, PHD</u>

Charles E. Bates, PhD, deposes and states as follows:

1.     I am the Chairman of Bates White, LLC ("Bates White"), which maintains offices at 2001 K Street NW, North Building, Suite 500, Washington, DC 20006.

2.     I am duly authorized to make this Declaration as a consultant for Bestwall LLC ("Bestwall" or the "Debtor") in this case. I make this Declaration at the request of the Debtor's counsel regarding the need and usefulness of the information requested in *Debtor's Motion for Order Pursuant to Bankruptcy Rule 2004 Directing Submission of Personal Injury Questionnaires by Pending Mesothelioma Claimants* (the "PIQ Motion") and in *Debtor's Motion for Bankruptcy Rule 2004 Examination of Asbestos Trusts* (the "Trust Discovery Motion"). In particular, I explain the need for the requested information to prepare a reliable estimate of Bestwall's legal liability for mesothelioma claims; assess whether Bestwall's pre-petition settlements and resolutions of mesothelioma claims in the tort system represented its liability for such claims and can be extrapolated to estimate the Debtor's liability for current and future claims; provide support to the Debtor in designing Trust Distribution Procedures ("TDPs") that

---

[1]     The last four digits of the Debtor's taxpayer identification number are 5815. The Debtor's address is 133 Peachtree Street, N.E., Atlanta, Georgia 30303.

will provide payments to claimants that cover Bestwall's share of any liability for current and future mesothelioma claims; and evaluate payments to claimants based on the distribution procedures that accompany the plan of reorganization proposed by the Asbestos Claimants' Committee ("ACC") and the Future Claimants' Representative ("FCR").

3.      In my declaration filed on June 19, 2020 regarding Bestwall's estimation motion (Doc. No. 1207-1) (the Estimation Declaration), I discussed the information needed to prepare a reliable estimate of Bestwall's legal liability.  Rather than repeating that testimony here, I have attached a copy of the Estimation Declaration (Exhibit A), and incorporate my statements in that declaration into this one.

4.      In this Declaration, I first provide some basic background on a legal liability estimate for purposes of providing context with respect to the need for the information.  Second, I describe certain additional information regarding the need for the information sought in the PIQ Motion.  Finally, I describe certain additional information regarding the need for the information sought in the Trust Discovery Motion.

## I.   *Qualifications*

5.      A detailed description of Bates White's and my experience and expertise is contained in my Estimation Declaration and November 2, 2017 Declaration, attached as Exhibit A to the Debtor's *Ex Parte Application of the Debtor for an Order Authorizing It to Retain and Employ Bates White, LLC as Asbestos Consultants as of the Petition Date*.[2]  In addition, a complete and updated copy of my *curriculum vitae* is attached to my Estimation Declaration as Exhibit 1.

---

[2]     *Ex Parte Application of the Debtor for an Order Authorizing It to Retain and Employ Bates White, LLC as Asbestos Consultants as of the Petition Date*, Nov. 2, 2017, Doc. 29, pp. 11–26.

6.      This Court issued an *Ex Parte Order Authorizing the Debtor to Retain and Employ Bates White, LLC as Asbestos Consultants as of the Petition Date*.[3]

## II.  *Overview*

7.      In my Estimation Declaration, I included a chart (p. 3) depicting the components of a legal liability estimate, including the factors that bear on the estimate.  I then described specific categories of information needed to prepare a reliable estimate (pp. 3-9).  I will not repeat that testimony here, but will begin by describing some general principles that support using a legal liability estimate rather than an estimate based on a defendant's settlement history to determine a company's liability for asbestos claims.

8.      There are multiple reasons why the amount paid to settle a disputed claim may not reflect or equate to a defendant's actual liability for such claim.  A company like Bestwall may spend large amounts of money on settlements when it faces little actual liability.  Fundamentally, such settlements are rooted in the economic differences between defending and prosecuting asbestos exposure-related lawsuits.  It is a well-established principle in the Law and Economics literature that the amount that a defendant pays and a plaintiff accepts to settle a lawsuit is not a direct measure of the defendant's liability.[4]

---

[3]     *Ex Parte Order Authorizing the Debtor to Retain and Employ Bates White, LLC as Asbestos Consultants as of the Petition Date*, Nov. 2, 2017, Doc. 40.

[4]     *See*, for instance:
Richard A. Posner, "An Economic Approach to Legal Procedure and Judicial Administration," *Journal of Legal Studies* 2, no. 2 (1973): 399–458;
Lucian A. Bebchuk, "Litigation and Settlement Under Imperfect Information," *RAND Journal of Economics* 15, no. 3 (1984): 404–15;
George L. Priest and Benjamin Klein, "The Selection of Disputes for Litigation," *Journal of Legal Studies* 13, no. 1 (1984): 1–55;
David Rosenberg and Steven Shavell, "A Model in which Suits Are Brought for Their Nuisance Value," *International Review of Law and Economics* 5 (1985): 3–13;
Lucian A. Bebchuk, "Suing Solely to Extract a Settlement Offer," *Journal of Legal Studies* 17 no. 2 (1988): 437–50;
Lucian A. Bebchuk, "A New Theory Concerning the Credibility and Success of Threats to Sue," *Journal of Legal Studies* 25, no. 1 (1996): 1–25.

9.      Depending on the nature of the litigation, settlements can be lower or higher than liability.  Some situations will lead the parties to settle for an amount less than liability (a windfall to the defendant and a loss for the plaintiff), while others will lead the parties to settle for an amount more than the actual liability (a windfall to the plaintiff and a loss for the defendant).

10.     Factors that affect the amount that a defendant pays in settlement, other than its potential liability, include the direct costs of litigation, the potential impact on the defendant's reputation, the effect of litigation on the defendant's finances (stock price, ability to borrow, etc.), the time and resources that certain employees would have to spend on the process, and the distraction of management from the main business of the company.  The amount that plaintiffs accept for releasing a defendant from the litigation is also affected by factors other than liability alone.  Plaintiffs' litigation costs in personal injury claims also matter, though they are structured differently than defendants' costs.

11.     In asbestos litigation, there is a large asymmetry in avoidable costs between the defendants and the plaintiffs.  Mesothelioma plaintiffs typically name over 50 defendants in their complaints.[5]  Plaintiff depositions typically include many defense attorneys, but only one lawyer representing the plaintiff.  Because each defendant pays its own costs and defense lawyers typically bill by the hour, a defendant can avoid all of its future costs by settling with the plaintiff and leaving the case. In contrast, a plaintiff can only avoid future costs if he settles with the last defendant standing because whether the case goes to trial against one or multiple defendants has little effect on the cost the plaintiff will incur from continuing to pursue a claim.  This characteristic of asbestos cases means that defendants have more to save in costs than plaintiffs

---

[5]      Garlock Report, ¶ 123.

by settlement, which means plaintiffs can routinely extract a portion of the defendant's avoidable cost savings in settlement.

12.    Further, there is an additional source of asymmetry between the total expense a defendant expects to incur and the net recovery a claimant expects to receive from that defendant.  This is because the amounts that claimants recover are net of the contingency rate that plaintiff law firms charge over the amounts received from defendants.  Plaintiff law firms charge a 30% to 40% contingency rate over recoveries.  Therefore, for example, if the defendant and the claimant agree on a $100 settlement and the plaintiff law firm charges a 40% contingency rate, the defendant pays $100 for the settlement but the claimant only receives $60.  This means that any additional dollar that increases a settlement amount represents a higher cost to the defendant than the benefit for the claimant.  Thus, for a net payment to the claimant to reach a certain amount, the defendant has to spend proportionally more.  In other words, the claimant is less sensitive to changes in settlement amounts than the defendant due to the asymmetry in the structure of defendant payouts and claimant recoveries.

13.    Another reason that settlement payments may not reflect actual liability is the effect of withholding plaintiff exposure information, which Bestwall believes it experienced in cases filed against it starting with the bankruptcy wave of the early 2000s.  By withholding relevant alternative exposure information from a defendant in a particular case, a plaintiff can effectively increase the amount of the settlement the plaintiff can receive from the defendant.  First, with fewer available co-defendants disclosed, the defendant's liability share appears higher than it would if the plaintiff disclosed all sources of exposure, even in jurisdictions in which several liability apportionment rules.  Second, with the most likely contributors to a plaintiff's disease out of the case, the likelihood that a remaining defendant in the case will be found liable

appears higher than it would if all exposure sources were disclosed.  Third, if a plaintiff does not willingly disclose all sources of the plaintiff's asbestos exposure, the defendant must spend more money trying to find such exposure information through indirect sources.  Bestwall's resolution history is consistent with this effect, with the increase in the number of cases resolved for large payments to plaintiffs and the large increase in defense expenses observed after the bankruptcy wave of the early 2000s.

### III. *The information sought in the PIQ Motion*

14.    As explained above, Bestwall's expected liability is distinct from the settlements it paid historically or would have paid in the absence of bankruptcy.  Reliable estimation of expected liability requires analysis of the various factors relevant to compensatory award share and likelihood of plaintiff success, as well as the number of claims that could go to trial.  For the reliable estimation of Bestwall's liability with respect to current claims and for the valuation of current claims under other contexts such as an extrapolation of settlements or under TDPs, it is necessary to know the identity and characteristics of such pending claims.

15.    Based on my experience of working with a large number of asbestos defendants since the 1990s, asbestos defendants generally do not possess complete and up-to-date information for most pending claims for several reasons. Discovery may not have been initiated or completed; information provided by plaintiffs in discovery may not be complete or correct; or defendants in some cases may not collect certain information about claims and claimants until such claims resolve.  Moreover, as I explain in more detail below, Bestwall has no information at all for a number of claims that may exist but were not filed against Bestwall before it filed for bankruptcy protection.

16.    In my Estimation Declaration, I described the importance of the PIQ information in determining the number of mesothelioma claims actually pending against Bestwall.  The importance of this information is illustrated by *Garlock*.  As of its petition date, Garlock's claims database showed 5,813 "pending" mesothelioma claim records.  The PIQ process in that case revealed that about 2,000 of those 5,813 claim records in fact did not represent pending mesothelioma claims against Garlock.[6] The PIQs established that many claimants had already resolved their claims through dismissal or settlement; many did not have mesothelioma; many did not have Garlock exposure; and many had withdrawn or were no longer pursuing claims against Garlock.  Further, of the approximately 3,800 PIQ claimants who still asserted a pending claim against Garlock, only about 54% described any direct, bystander, or secondary exposure to Garlock's asbestos-containing products.[7]  Similarly, the PIQ process in the Bondex bankruptcy case revealed that about 1,500 of the 3,500 claims reflected as pending mesothelioma claims in the Bondex database in fact did not represent pending claims.[8]

17.    Based on my experience and analysis of Bestwall's claims and costs, Bestwall has incomplete information regarding most unresolved claims in its database.  In particular, among the 5,700 unresolved mesothelioma records in the Bestwall claims database there are about 3,000 records associated with law firms with which Bestwall had agreements, under which Bestwall paid settlement amounts based on an agreed-upon matrix or resolved groups of claims for negotiated lump sums without examining individual claims.  Historically, approximately 70% of

---

[6]    *See* Expert Report of Jorge Gallardo-García, PhD, *In re Garlock Sealing Technologies LLC, et al.,* No. 10-31607 (Bankr. W.D.N.C. Feb. 15, 2013) (Trial exhibit GST-8004) [hereinafter "Gallardo-García Garlock Report"], Exhibit 1 and ¶ 33.

[7]    Expert Report of Charles E. Bates, PhD, *In re Garlock Sealing Technologies LLC, et al.*, No. 10-31607 (Bankr. W.D.N.C. Feb. 15, 2013) (Trial exhibit GST-0996) [hereinafter "Garlock Report"], Exhibit 46.

[8]    Expert Report of Charles H. Mullin, PhD, *In re Specialty Products Holding Corp. et al.*, No. 10-11780 (Bankr. D. Del. Aug. 15, 2012), Doc 3473-5, pp. 22–23.

the mesothelioma claims Bestwall paid to settle after 2010 were resolved through these kinds of agreements. Bestwall entered into these arrangements to avoid the cost of going through discovery and gathering information to resolve the claims on a piecemeal basis. Instead, Bestwall incurred on average less than $3,000 in defense costs in connection with mesothelioma claims brought against it by these firms before resolving them as part of such agreements. As a result, Bestwall likely has little information about those 3,000 claims. Further, there are more than 600 mesothelioma unresolved records in Bestwall's claims database filed within the six months prior to Bestwall's Petition Date. Bestwall likely has little information about those claims, as the litigation process for such claims had just begun when Bestwall filed for bankruptcy protection.

18.     The second group of potentially pending mesothelioma claims are those not identified as such in Bestwall's claims database due to the lack of disease information. Bestwall currently has no practical way to identify whether these claims involve mesothelioma or some other disease. Because Bestwall did not participate in any additional tort discovery on these claims that continued after Bestwall's petition date (due to the automatic stay), and some of these claims may be dormant, Bestwall has no information on whether there are any unresolved mesothelioma claims within "unknown disease" records.[9] There are more than 21,300 of such records in Bestwall's claims database that appear as unresolved, of which about 5,400 appear as "open." In my experience, the vast majority of these records either represent old claims alleging non-malignant conditions or are abandoned claims with no prospects against the defendant. This is likely the case with most of the 21,300 unresolved records with unknown disease information,

---

[9]     Further, although some unresolved records show a non-mesothelioma disease, the claimant may indeed have mesothelioma. This type of error is possible in databases with hundreds of thousands of records.

as about 21,000 of them were filed more than four years before Bestwall's Petition Date.

However, there may be some active pending mesothelioma claims in this group of records, as

almost 300 were filed within four years of the Petition Date, including about 150 filed within a

year and about 70 filed in the six months prior to the Petition Date.

19.     The Bestwall claims database also contains no information on mesothelioma

claimants who may exist but have not filed a claim.  Bestwall therefore has no information on

these claims.  This lack of information is particularly acute with respect to claimants with

exposure profiles that Bestwall did not see in the tort system before its Petition Date.  For

instance, it is my understanding that the ACC and the FCR have argued that claimants alleging

exposures to Bestwall products beyond Old GP's Gypsum Division based on alleged asbestos

contamination may exist**.**  The Debtor has stated that it has no history of receiving such claims in

the tort system.  Therefore, because those claims are not in Bestwall's claims database, there is

no basis to estimate their number and evaluate any Bestwall liability with respect to them.  If

such claimants exist, information about them is needed to assess the extent of any liability

Bestwall may have for them.

20.     Based on my preliminary analysis of Bestwall's claims and resolutions history, I

expect that discovery in this matter will show that the number of entities sharing liability with

Bestwall in pending and future mesothelioma claims will be substantial.  As part of that

preliminary analysis, I have joined the publicly available Garlock Analytical Database[10] and

Bestwall's claims database to determine the overlap between the two claiming populations.  The

overlap is substantial: three out of four Bestwall/Old GP mesothelioma claims filed from 2002 to

---

[10]     This database is part of the Garlock Estimation Trial record that the *Garlock* Court made public.  For a
description of the Garlock Analytical Database, see Gallardo-García Garlock Report.

Garlock's petition date on June 5, 2010 were also claims filed against Garlock, and three-fourths

of Bestwall's/Old GP's payments to mesothelioma claimants during this time period were to

claimants who also pursued claims against Garlock. These data, however, do not provide

sufficient information about Bestwall's and Old GP's historical claims, because about one-

quarter of Bestwall's mesothelioma claims that were filed before Garlock's petition date were

not asserted against Garlock (including many of Bestwall's highest-value claims) and because

the Garlock data do not include claims filed after June 5, 2010 (Garlock's petition date and more

than seven years before Bestwall commenced this case).

21.     Finally, the information requested in the PIQ Motion will be essential for

calculating and estimating the potential settlement offers that Bestwall claimants would receive

from an eventual section 524(g) trust established in this case.  For example, the PIQ information

in *Garlock* was fundamental for this task.  After the Garlock Estimation Trial, once Garlock, the

asbestos committee in that case, and the future claimants' representative in that case reached a

settlement regarding total trust funding, the data gathered through the Garlock PIQ was a key

input in calculating the settlement offers that different types of claimants would receive from the

Garlock trust's Claims Resolution Procedures (the "CRP").  Based on Bates White's analysis

using the Garlock Analytical Database, of which the PIQ data was a principal component, the

parties were able to determine the level of baseline settlement offer values for the Garlock trust.

As these data were an important input for determining trust settlement offers, the PIQ data in

*Garlock* also enabled my team at Bates White and me to evaluate whether the trust funding under

the Garlock Plan would allow the Garlock Trust to provide substantially equivalent treatment to

pending and future claimants.  The PIQ data requested here in the PIQ Motion will play a similar

role in allowing me to evaluate any proposed plan of reorganization, the design and evaluation of

TDPs and payments to claimants at levels that are substantially equivalent for present and future claimants.

## IV. *The information sought in the Trust Motion*

22.    The information Bestwall requests from asbestos trusts is fundamental for estimating Bestwall's legal liability.  It is also critical to test whether claimants withheld exposure information from Bestwall while in the tort system and how its payments to claimants were impacted by such practices.  This data is needed to assess contentions from the ACC and FCR that Bestwall's historical settlements reflect its liability and their contentions that Bestwall's historical settlements reveal amounts necessary to induce claimants to accept a plan of reorganization in this case.  The proposed trust discovery will permit us to compare data from asbestos trusts that document claimants' exposures to the products of the reorganized entities with what those same claimants revealed about their asbestos exposures in their tort litigation against Bestwall and Old GP.

23.    Having trust claims information on Bestwall claims resolved with payments within a wide range of values will permit me to evaluate the impact on historical settlement amounts caused by claimants delaying the filing of trust claims and failing to disclose to Old GP the exposure evidence supporting them.  In addition, analysis of the settlements under the Law and Economics model will permit me to test how the non-disclosure of trust exposure evidence may have affected the likelihood of success factor under the model in historical cases.

24.    The trusts and the trust processing facilities possess the requested information in readily available electronic form.  The trusts' search can be performed electronically with simple computer code.  Bestwall has Social Security Numbers ("SSNs") for most mesothelioma claims it resolved by settlement or verdict.  Using SSNs to match Bestwall's settled and tried cases to

the trusts' databases will yield a reliable identification of claimants and will minimize the risk of false positives.  In particular, the computer code required for identifying claims in the trusts' databases will be very simple, as it will only have to focus on SSN matches or matches of the last four digits of the SSN plus last name.

## V.  *Data security.*

25.    In the ordinary course of business, Bates White routinely receives privileged and confidential information, often highly sensitive in nature.  Bates White has data security protocols that implement industry best practices for data confidentiality and protection.  Such protocols include, but are not limited to, the following safeguards: (a) each staff member has unique log-in credentials to access Bates White's systems; (b) data access in each matter is limited to staff based on "need to know" and "least privilege" principles, which includes time restrictions and other controls as necessary; (c) transmission of confidential or privileged information is done through encrypted file sharing systems that are password-protected (all media that leave Bates White are encrypted and password-protected); (d) physical external media with confidential information are secured in a locked safe or cabinet; (e) to comply with data destruction requirements, external media are destroyed, and external hard drives and laptops are wiped to ensure all data are removed; and (f) Bates White's network is protected by next-generation firewalls, web filtering, intrusion detection and prevention capabilities, and 24/7 monitoring by a third party.  Bates White also deploys next-generation antivirus to all endpoints, two-factor authentication for external connections, and data loss protection designed to monitor and prevent theft and unauthorized uses of data.  All Bates White employees must complete a cybersecurity training program.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the
foregoing is true and correct.

Dated: July 30, 2020

_____
Charles E. Bates, Ph.D.
BATES WHITE, LLC
2001 K Street NW
North Building, Suite 500
Washington, DC 20006
Telephone:  (202) 408-6110
Facsimile:  (202) 408-7838

# Exhibit A

# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | |
|---|---|
| In re | Chapter 11 |
| BESTWALL LLC, | Case No. 17-31795 (LTB) |
| Debtor. | |

## DECLARATION OF CHARLES E. BATES, PHD

Charles E. Bates, PhD, deposes and states as follows:

1.      I am the Chairman of Bates White, LLC ("Bates White"), which maintains offices at 2001 K Street NW, North Building, Suite 500, Washington, DC 20006.

2.      I am duly authorized to make this Declaration as a consultant for Bestwall LLC ("Bestwall" or the "Debtor") in this case.  I make this Declaration at the request of the Debtor's counsel regarding (1) the data and claims-related information Bates White needs to (a) render a reliable estimate of Bestwall's liability for present and future mesothelioma claims and (b) properly evaluate any estimation opinions or other opinions or positions related to the value of asbestos claims offered by the Asbestos Claimants Committee ("ACC"), the Future Claimants' Representative ("FCR"), or their experts, and (2) the work Bates White has performed for the Debtor and its counsel to date in this chapter 11 case.

3.      In this Declaration, I first describe the information necessary to perform a reliable estimation of Bestwall's legal liability with respect to mesothelioma claims and to evaluate the settlement extrapolation analyses that, I understand, the ACC and FCR experts will render in this matter.  Much of this information is unavailable to the Debtor, either in whole or in significant

part.  Next, I provide a summary overview of the work Bates White has performed for the Debtor

and its counsel since the start of this bankruptcy case.

## I.    _Qualifications_

4.    I specialize in the application of statistics and computer modeling to economic

and financial issues.  I have more than 25 years of experience in a wide range of litigation and

commercial consulting areas, including extensive experience working on asbestos-related claims

and liability valuation issues.  A detailed description of Bates White's and my expertise is

contained in my November 2, 2017 Declaration, attached as Exhibit A to the Debtor's _Ex Parte_

_Application of the Debtor for an Order Authorizing It to Retain and Employ Bates White, LLC as_

_Asbestos Consultants as of the Petition Date_.[1]  In addition, a complete and updated copy of my

curriculum vitae is attached to this Declaration as Exhibit 1.

5.    This Court issued an _Ex Parte Order Authorizing the Debtor to Retain and_

_Employ Bates White, LLC as Asbestos Consultants as of the Petition Date_.[2]

## II.   _Data and claims-related information necessary to render a reliable estimate of Bestwall's_
## _liability for present and future mesothelioma claims._

6.    Bestwall's counsel has requested that I estimate Bestwall's legal liability for

mesothelioma claims, i.e., Bestwall's share of final judgments that would be obtained by current

and future Bestwall mesothelioma claimants.

---

[1]    Ex Parte Application of the Debtor for an Order Authorizing It to Retain and Employ Bates White, LLC as
Asbestos Consultants as of the Petition Date, Nov. 2, 2017, Doc. 29, pp. 11–26.

[2]    Ex Parte Order Authorizing the Debtor to Retain and Employ Bates White, LLC as Asbestos Consultants as
of the Petition Date, Nov. 2, 2017, Doc. 40.

**Figure 1. Components of the estimate of Bestwall's Expected Legal Liability for current and future mesothelioma claims**



- Disease manifestation
- Causation
- Apportionment rules among parties sharing liability
- Number of parties sharing liability
- Compensatory amounts
- Other parties' offsets and contributions
- Likelihood of plaintiff's success in case
- Identify pending and future claimants

7.     As demonstrated in Figure 1, Bestwall's Expected Legal Liability with respect to a given present or future claimant has two principal components: (1) the expected Bestwall Compensatory Award Share with respect to such claimant and (2) the expected likelihood of such claimant's success at trial (the Likelihood of Plaintiff's Success).  As further demonstrated in Figure 1, the extent of Bestwall's Expected Legal Liability is determined by consideration of the factors listed on the right.

8.     Below, I explain the data and claims-related information the methodology requires to render an estimate of Bestwall's liability for present and future mesothelioma claims.

9.     **Status of Bestwall claims.**  It is first necessary to identify the number and characteristics of the mesothelioma claims that would currently be asserted against Bestwall.  As of today, there are at least three groups of potential current mesothelioma claimants: (1) claimants who filed pre-petition mesothelioma claims against Bestwall or the former

Georgia-Pacific LLC ("Old GP")[3] and are reflected in Bestwall's claims database as having an unresolved mesothelioma claim; (2) claimants who filed pre-petition mesothelioma claims but are not listed in the database as having an unresolved mesothelioma claim (e.g., because the database does not have information about the claimant's alleged disease); and (3) claimants who developed mesothelioma and allege contact with Bestwall's asbestos-containing products but did not file a pre-petition claim against Bestwall.

10.     The Bestwall claims database contains more than 5,600 records identified as unresolved mesothelioma claims.  However, the number of records that actually represent a pending mesothelioma claim against Bestwall is unknown, and information is necessary to determine which of the records that actually do represent pending mesothelioma claims.  This is the case for several reasons.  First, about 2,000 of those records appear to have been resolved before Bestwall's petition date but were in different states of documentation.[4]  Of those, 1,800 are described as resolved without payment; thus, most, if not all, of those records likely represent dismissed claims.  The remaining 200 of the 2,000 records appear as "settled but not documented," which may or may not indicate that a settlement was reached.  The remaining 3,600 of the 5,600 unresolved pending mesothelioma records are described as "open," which appears to indicate they represent pending claims as of the petition date.  But more than 800 had been filed more than four years before Bestwall's petition date.  It is necessary to determine which of these 800 records represent active claims against the Debtor.

---

[3]     When discussing historical matters preceding a 2017 corporate restructuring by Old GP, the term "Debtor" and "Bestwall" refer to the Debtor and the historical businesses that manufactured or marketed asbestos-containing products when they were part of Old GP or Bestwall Gypsum.

[4]     These claim records in the Bestwall claims database include those with the following statuses: "dismissed but not documented," "inactive," "resolved but not finalized," and "settled but not documented."

11.    The fact that a substantial number of mesothelioma records shown as unresolved or pending in the Bestwall claims database are neither unresolved nor pending claims is typical. In my experience, asbestos claims databases consistently do not contain up-to-date information on abandoned or dismissed claims because keeping track of that information is costly and provides no benefit to the defendants in the tort system.

12.    The Bestwall claims database includes unresolved records with no alleged disease information.  Because no additional tort discovery on these claims continued after Bestwall's petition date (and any discovery relating to other defendants proceeded without Bestwall's participation due to the automatic stay), Bestwall has no information on whether there are any unresolved mesothelioma claims within "unknown disease" records.[5]

13.    The Bestwall claims database also contains no information on mesothelioma claimants who may exist but have not filed a claim.  Therefore, although claimants who have not filed claims may currently exist, Bestwall has no information on them.

14.    Determining the actual number of pending mesothelioma claims against Bestwall is a critical starting point for any evaluation of Bestwall's liability.  It is necessary to determine the extent of Bestwall's liability for the current claims and is also essential for estimating the number of future mesothelioma claims that could proceed to trial against Bestwall.  To estimate Bestwall's liability for future mesothelioma claims, I will project the number of future claims that will be filed and the trial risk associated with each claim.  This estimate will take into account differences in demographic characteristics and exposure profiles.  However, I am currently unable to perform this estimate because of the lack of information on the number and

---

[5]    Further, although some unresolved records show a non-mesothelioma disease, the claimant may indeed have mesothelioma.  This type of error is possible in databases with hundreds of thousands of records.

Case 21-81095 Doc 1288-2 Filed 07/31/20 Entered 07/31/20 00:34:57 Desc
Case 17-31795 Doc 128-2 Filed 07/14/20 Entered 07/31/20 00:34:57 Page ID #: 193

Exhibit 3    Page 21 of 35

type of current claims alleging Bestwall exposure, and on other exposure allegations made by holders of Bestwall resolved and current claims in their claims submitted to asbestos trusts.

15.     **Identifying information for the individual with mesothelioma and the individual pursuing the claim.**  For the individual with mesothelioma, we need 9-digit Social Security Number ("SSN"), gender, birth date, life status, death date (if applicable), and state of residency.  For the individual pursuing the claim, we need name and SSN.  This information is essential for identifying claimants across the multiple sources of asbestos claims information available in this matter.  In addition, this information is necessary to identify multiple claims that may have been generated by a single mesothelioma diagnosis, such as personal injury and wrongful death claims for the same person.  This is important for valuation purposes, because these claims may appear twice in the claims database but represent a single mesothelioma diagnosis.

16.     **Diagnosis information.**  This information includes the date of diagnosis and the mesothelioma body site (e.g., pleural versus peritoneal).  This information is necessary to assess the viability of the claim and to understand the potential economic loss for the claimant and, accordingly, the possible damage amount.  Although Bestwall's database includes general disease information for many claim records, as discussed above, there may be unidentified mesotheliomas in the database.  Similarly, the database includes diagnosis dates for a number of records, but it lacks this information for a large number of unresolved records.  The diagnosis date provides information about when the alleged disease manifested, so that it can be determined what portion of total diagnoses in a given year were pursued against Bestwall.  Also, as described above, the database contains no information on claims that were not filed pre-

petition.  Further, Bestwall's claims database does not include information on the mesothelioma body site.

17.     **The injured party's alleged exposure to asbestos-containing products for which Bestwall is responsible.**  The methodology requires information concerning the injured party's alleged exposure to Bestwall asbestos-containing products.  We currently have little exposure information for current claims, including how many claimants will actually assert contact with a Bestwall asbestos-containing product.

18.     If the claimant alleges Bestwall exposure, the methodology requires, for each alleged exposure, information regarding type of exposure (occupational, non-occupational, secondary), location where the exposure allegedly occurred, dates of alleged exposure, occupation/job type of individual while the alleged exposure occurred, and specific Bestwall products to which the individual alleges exposure.  This information regarding the nature and extent of the plaintiff's exposure is fundamental for assessing the share of liability (if any) that Bestwall should cover for that claim.

19.     **The injured party's alleged exposure to asbestos-containing products manufactured by or associated with other entities.**  The methodology also requires information concerning allegations of exposure to non-Bestwall asbestos-containing products and, for each alleged exposure, basic exposure-related information, including type of such exposure (occupational, non-occupational, secondary), location where the exposure allegedly occurred, dates of alleged exposure, occupation/job type of the individual while the alleged exposure occurred, and specific products to which the individual alleges exposure.

20.     In apportioning damages, it is first necessary to identify and quantify the number of entities and codefendants that would share in the liability with Bestwall, should Bestwall be

found liable.  This determination requires sufficient information on claimants' work and alleged

exposure histories so that the sources of asbestos exposure for claimants can be identified and

accounted for.

21.    Information on current and past claimants' job histories and exposure to other

companies' asbestos-containing products is essential to identify alternative sources of exposure

and assess the relative contribution of Bestwall asbestos-containing products (if any) to a

claimant's alleged asbestos exposure.  The exposure-related information will be supplemented

and compared to the information we would obtain on the claimant's asbestos trusts filings and

tort claims, to construct a full description of the exposure profiles of claimants with a pending

mesothelioma claim against Bestwall.  This information is central to liability apportionment and

for the estimation of the likelihood of plaintiff's success against Bestwall, but it is unavailable in

the Debtor's database.

22.    **Injured party's economic loss.**  Economic loss is another fundamental

component of a liability estimate because it enables us to ascertain the expected award that a

claimant may receive should he or she proceed to trial and prevail.  Economic loss estimates are

based on the claimant's demographic information, as well as on information related to lost

income and expenses caused by the alleged disease.  They require information about key

claimant characteristics, including work/retirement status, current or last occupation, current or

last annual income, medical expenses, dependent information, and funerary expenses (if

applicable).

23.    **Information about the claimants' lawsuits and claims against other entities.**

Information about other parties' payments to claimants and the status of claims against other

entities is important for producing a reliable estimation of Bestwall's share of liability for a given claim.

24.     To apply the liability apportionment rules described above, it is necessary to obtain information regarding claimants' settlements and recoveries from tort defendants and asbestos trusts.  This information permits us to take into account offsets when estimating Bestwall's share of the liability, if any.  Bestwall does not possess sufficient information that would enable it to evaluate amounts that claimants have recovered or will recover from other sources.

25.     Basic information regarding the plaintiffs' claims against other entities, their status, and the amounts the claimants have recovered from those entities is not included in the Bestwall claims database.  This is particularly the case for plaintiffs' trust claims for claims resolved by Bestwall in the tort system and for unresolved current claims.

### III. *Data and claims-related information necessary to evaluate opinions offered by the experts for the Asbestos Claimants Committee and the Future Claimants' Representative*

26.     I understand that the ACC and the FCR contend that Bestwall's settlement history reflects Bestwall's legal liability for settled claims and that Bestwall settlement payments should be used as proxies for Bestwall's liability for current and future claims.  Additional data are needed to demonstrate and quantify to what extent this is the case.

27.     Much of the information needed to quantify the impact of avoidable costs and the actual exposure profile of Bestwall claimants on Bestwall's settlements is not currently available to Bestwall.

28.     I understand that Bestwall has little information on the exposure profile of claims dismissed without payment and what distinguishes them from other claims.

29.      Bestwall has little or no information on the exposure profile or the other

characteristics of group settlement claims that distinguish them from each other or from claims

that the plaintiffs abandoned without payment, or explains why some claims were paid and not

others.

30.      The data I described in detail above are needed to quantify Bestwall's legal

liability for claims individually litigated but not prepared for trial and claims prepared for trial

but settled before trial started.

31.      Although Bestwall has more robust information on claims settled during trial,

information is still needed to assess the extent of alternative exposures.

32.      Bestwall has substantial information on claims that proceeded to verdict.  But,

even for these cases, information on alternative exposures is necessary.

33.      Information on trust claims filings will be essential.  By comparing exposure

allegations in the tort system to allegations in the plaintiffs' trust claims, I can determine whether

settlement (and verdict) amounts can be properly extrapolated into the future.

34.      Further, the information on current claims against Bestwall that I discussed above

is also necessary for the opposing experts' settlement approach.

## IV. *Bates White's work to date in this case*

35.      In this section, I provide a summary of the work that Bates White has performed

since the commencement of Bestwall's chapter 11 case.

36.      The principal tasks that Bates White has undertaken are the following:

*a.*      Construction of the preliminary Bestwall Analytical Database

*b.*      Update of the model to estimate and forecast mesothelioma incidence

    *c.*      Analysis of Bestwall's claims history and defense costs data for estimation of Bestwall's legal liability

    37.     Below I provide more detail on each of these tasks.  At the direction of counsel, I am providing only a high-level overview to protect attorney-client-privileged and work product–protected information.

### a. *Construction of the preliminary Bestwall Analytical Database*

    38.     The Bestwall Analytical Database is and will be the foundation for most of the analyses Bates White will perform in this case.  In particular, this database will be the foundation for my estimate of Bestwall's legal liability.

    39.     Part of the work that Bates White has performed to date relates to the development of an updated analytical database using other sources of information available to us (such as the publicly available Garlock Analytical Database, limited data from the Social Security Administration, and a copy of the Manville Trust database as of 2002 purchased by Bates White, among others).

    40.     Although we have been able to add information to update the existing claims database, as described above, other fundamental information is necessary to construct a database of reliable information for Bestwall asbestos claims, as described in detail in Sections II and III above.  None of the other sources of data we have been able to use has information collected specifically with respect to Bestwall mesothelioma claims.  In the present matter, the work on the construction of the preliminary Bestwall Analytical Database has taken approximately 35% of Bates White's fees so far.

**b.**  *Update of model to estimate and forecast mesothelioma incidence*

41.    As I explained above, a central element of the estimate of Bestwall's legal liability is a forecast of the number of mesothelioma diagnoses that will arise in the future.  For this purpose, Bates White has been developing an updated version of an incidence model.

42.    This task involves a number of components.  Those include researching the applicable literature and publicly available data and incorporating that research into the model by developing complex computer code to model and estimate incidence.  This project has constituted approximately 30% of Bates White's fees in this matter so far.

**c.**  *Analysis of Bestwall's claims history and defense costs data for estimation of Bestwall's legal liability*

43.    Settlement payments, together with defense costs data, provide useful information to assess the extent to which claims are settled for trial risk or to avoid defense costs.  Bates White has been engaged in a detailed and iterative analysis of the available data.  Some of this analysis is reflected in Section III above and informs my opinions about the information necessary to assess the ACC's and FCR's proposed valuation approaches in this matter.  In addition, this analysis was the basis for providing support to the Debtor and its counsel during the mediation proceedings the Court ordered early in 2020.  This analysis has constituted approximately 25% of Bates White's fees in this matter so far.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 19, 2020

_____
Charles E. Bates, Ph.D.
BATES WHITE, LLC
2001 K Street NW
North Building, Suite 500
Washington, DC 20006
Telephone:   (202) 408-6110
Facsimile:  (202) 408-7838

**Exhibit 1**

Curriculum Vitae



2001 K Street NW North Building, Suite 500
Washington, DC 20006
Main 202. 208. 6110

# CHARLES E. BATES, PHD

**Chairman**

**AREA OF EXPERTISE**

- **Asbestos liabilities and expenditures estimation**
- **Economic analysis**
- **Statistical analysis**
- **Microsimulation modeling**
- **Econometrics**



## SUMMARY OF EXPERIENCE

Charles E. Bates has extensive experience in statistics, econometric modeling, and economic analysis. He specializes in the application of statistics and computer modeling to economic and financial issues. Dr. Bates has more than 25 years of experience and provides clients with a wide range of litigation and commercial consulting services, including expert testimony and guidance on economic and statistical issues.

Dr. Bates is a recognized expert in asbestos-related matters. He speaks in national and international forums on the asbestos litigation environment and estimation issues. Dr. Bates is frequently retained to serve as an expert on such matters in large litigations and has testified before the US Senate Judiciary Committee and Federal Bankruptcy Court.

## EDUCATION

- Advanced Seminar in Pharmacoeconomics, Harvard School of Public Health
- PhD, Economics, University of Rochester
- MA, Economics, University of Rochester
- BA, Economics and Mathematics (high honors), University of California, San Diego

## PROFESSIONAL EXPERIENCE

Prior to founding Bates White, Dr. Bates served as a Vice President of A.T. Kearney. Previously, he was the Partner in Charge of the Economic Analysis group at KPMG. Dr. Bates began his career on the faculty of Johns Hopkins University's Department of Economics, where he taught courses in advanced statistical economic analysis and trade theory.

## SELECTED ASBESTOS AND PRODUCT LIABILITY EXPERIENCE

- Retained as an asbestos liability valuation expert on behalf of the debtor in the matter *In re DBMP LLC* pending in the US Bankruptcy Court for the Western District of North Carolina, Charlotte Division.

- Retained as an asbestos liability valuation expert on behalf of the debtor in the matter *In re Bestwall LLC* pending in the US Bankruptcy Court for the Western District of North Carolina, Charlotte Division.

- Retained as an asbestos liability valuation expert on behalf of Truck Insurance Exchange in the matter *In re Kaiser Gypsum Company, Inc., et al.* pending in the US Bankruptcy Court for the Western District of North Carolina, Charlotte Division.

- Served as an asbestos liability valuation expert on behalf of Garlock Sealing Technologies in its bankruptcy proceedings. Testified before the US Bankruptcy Court for the Western District of North Carolina both in preliminary case hearings and at trial.

- Served as an expert in asbestos claims valuation for financial reporting purposes in *Erica P. John Fund Inc. et al. v. Halliburton Company et al.* on behalf of certain Halliburton stockholders regarding Halliburton's financial disclosures of its asbestos liabilities after its acquisition of Dresser in 1998.

- Served as the Individual Claimant Representative on behalf of potential future No Notice Individual Creditors as part of the Amending Scheme of Arrangement for OIC Run-Off Limited (formerly the Orion Insurance Company plc).

- Authored expert reports and provided testimony in *United States Fid. & Guar. Co. v. American Re-Insurance Company* in asbestos claims valuation, estimation methodology, and asbestos reinsurance billing regarding the proper reinsurance bill associated with USF&G's reinsurance bill of its asbestos-related payments to Western MacArthur.

- Served as an asbestos liability valuation expert on behalf of Specialty Products Holding Corp./Bondex International in its bankruptcy proceedings.

- Retained as an asbestos liability valuation expert on behalf of the Official Committee of Unsecured Creditors of Motors Liquidation Company (f/k/a General Motors Corporation) in its bankruptcy proceedings.

- Authored expert report and provided deposition testimony regarding the value of diacetyl claims on behalf of the Official Committee of Equity Security Holders in the Chemtura Corporation bankruptcy proceedings.

- Testified in deposition on behalf of the ASARCO Unsecured Creditors Committee in the ASARCO bankruptcy proceedings regarding the valuation of past and future asbestos-related personal injury claims.

- Authored expert report and provided deposition testimony on behalf of the policyholder in the matter of *Imo Industries, Inc. v. Transamerica Corp.*

- Currently retained as an expert by Fortune 500 companies to produce asbestos expenditure estimates for annual and quarterly financial statements. Estimations aid clients with Sarbanes-Oxley compliance.

- Currently retained as an expert in asbestos estimation and insurance valuation, for numerous asbestos litigation matters, on behalf of insurance companies, corporations, and financial creditors' committees of federal bankruptcy proceedings.

- Testified before the Senate Judiciary Committee on the economic viability of the Trust Fund proposed under S.852, the Fairness in Asbestos Injury Resolution (FAIR) Act of 2005. Testimony clarified Bates White's independent analysis on the estimate of potential entitlements created by the administrative no-fault trust fund that uses medical criteria for claims-filing eligibility.

- Testified in deposition on behalf of Liberty Mutual Insurance Company in the Plibrico bankruptcy proceedings regarding the valuation of past and future asbestos personal injury claims and exposure criteria in plan proponents proposed trust distribution procedures.

- Testified at deposition on behalf of the joint insurers defense committee to address the fraction of expenditures associated with the company's asbestos installation operations in *Owens Corning v. Birmingham Fire Insurance Company of Pennsylvania.*

- Testified in the Babcock & Wilcox bankruptcy confirmation hearing on behalf of the Insurers Joint Defense Group to address asbestos liability. Developed claims criteria evaluation framework to assess asbestos liability forecasts and trust distribution procedures.

- Testified at deposition on behalf of Sealed Air in the fraudulent conveyance matter regarding the 1998 acquisition of Cryovac from W.R. Grace. Directed estimation of foreseeable asbestos liability for fraudulent conveyance matter to advise the debtor in the bankruptcy of a defendant with over $200 million in annual asbestos payments. Developed asbestos liability forecasting model and software. Directed industry research and interviewed industry experts.

- Testified at deposition on behalf of Hartford Financial Services Group to address the asbestos liability of MacArthur Company and Western MacArthur Company. Estimated asbestos liability in the context of bankruptcy proceedings.

- Testified at deposition on behalf of the Center for Claims Resolution in arbitration proceedings of *GAF v. Center for Claims Resolution.*

- Served as testifying expert on behalf of CSX Transportation on the suitability of asbestos claim settlements for arbitration proceedings of *CSX Transportation, Inc. v. Lloyd's, London.*

- Developed an econometric model of property damage lawsuits for estimating the future liability of a former asbestos manufacturer arising from the presence of its asbestos products in buildings.

## SELECTED LITIGATION AND CONSULTING EXPERIENCE

- Testified in US Tax Court on behalf of the taxpayers on the statistical basis and accuracy of shrinkage accruals in *Kroger v. Commissioner.*

- Served as consulting expert and performed statistical and quantitative analyses to assess the merits of a class action alleging payment of fees to mortgage brokers for referral of federally related mortgage loans.

- Testified in US Tax Court on behalf of the taxpayer analyzing the statistical prediction of bond ratings using company financial data in *Nestlé Holdings Inc. v. Commissioner.*

- Submitted written expert testimony on the statistical and financial analysis of option transactions and an analysis of alternative stock option hedges in *McMahon, Brafman, and Morgan v. Commissioner.*

- Testified in US Tax Court on behalf of the taxpayers of IRS experts on the statistical basis and accuracy of shrinkage accruals in *Wal-Mart v. Commissioner.*

- Served as consulting expert and analyzed the racial composition for a large manufacturing corporation using EEO data and employed sophisticated statistical analysis and modeling to determine the validity and strength of an employment discrimination claim.

- Testified on behalf of VNC in the arbitration hearing of *VNC v. MedPartners.*

- Provided expert testimony in California Superior Court on the validity of economic comparability adjustments for pipeline easement rents in *Southern Pacific Transportation Corp. v. Santa Fe Pacific Corp.*

- Served as statistical expert and developed detailed statistical analysis of customs trade data for use in criminal transfer-pricing litigation.

- Submitted written testimony in US Tax Court on the beneficial life of company credit card in a tax matter for a large retailer drawing on the company's point-of-sale data, credit card data, and customer demographic information.

- Developed state-of-the-art models to account for default correlation for underwriting credit insurance; models became the standard tools for the country's largest credit insurance firm.

- Led a team of economists that provided litigation-consulting services in one of the largest US price-fixing cases. Case involved the development of state-of-the-art economic models, damages' analyses, client presentations, pretrial discovery, industry research, preparation of evidence and testimony, depositions, and a critique of opposing expert analyses and reports.

- For a start-up global telecommunications enterprise, provided consulting services and developed a comprehensive computer model to evaluate the firm's financial plan. Model incorporated marketing, pricing, and communications traffic in a single modeling framework to facilitate sensitivity analysis by creditors and to evaluate the risk associated with the strategic business plan.

- Served as senior economic advisor on issues of analytical methodology for numerous pharmacoeconometric and health outcomes research projects. Provided expertise in the development of decision tools and the creative use of modeling applications for pharmacoeconomics and outcomes research.

## PUBLICATIONS

- Bates, Charles E., Charles H. Mullin, and Marc C. Scarcella. "The Claiming Game." *Mealey's Litigation Report: Asbestos* 25, no. 1 (February 3, 2010).

- Bates, Charles E., Charles H. Mullin, and A. Rachel Marquardt. "The Naming Game." *Mealey's Litigation Report: Asbestos* 24, no. 15 (September 2, 2009).

- Bates, Charles E., and Charles H. Mullin. "State of the Asbestos Litigation Environment—October 2008." Mealey's Litigation Report: Asbestos 23, no. 19 (November 3, 2008).

- Bates, Charles E., and Charles H. Mullin. "Show Me The Money." *Mealey's Litigation Report: Asbestos* 22, no. 21 (December 3, 2007).

- Bates, Charles E., and Charles H. Mullin. "The Bankruptcy Wave of 2000—Companies Sunk By An Ocean Of Recruited Asbestos Claims." *Mealey's Litigation Report: Asbestos* 21, no. 24 (January 24, 2007).

- Bates, Charles E., and Charles H. Mullin. "Having Your Tort and Eating It Too?" *Mealey's Asbestos Bankruptcy Report* 6, no. 4 (November 2006).

- Bates, Charles E., and Halbert White. "Determination of Estimator with Minimum Asymptotic Covariance Matrices." *Econometric Theory* 9 (1993).

- Bates, Charles E., and Halbert White. "Efficient Instrumental Variables Estimation of Systems of Implicit Heterogeneous Nonlinear Dynamic Models with Nonspherical Errors." In *International Symposia in Economic Theory and Econometrics,* vol. 3, edited by W.A. Barnett, E.R. Berndt and H. White. New York: Cambridge University Press, 1988.

- Bates, Charles E. "Instrumental Variables." In *The New Palgrave: A Dictionary of Economics,* edited by John Eatwell, Murray Milgate, and Peter Newman. London: Macmillan, 1987.

- Bates, Charles E., and Halbert White. "An Asymptotic Theory of Consistent Estimation for Parametric Models." *Econometric Theory* 1 (1985).

## SELECTED SPEAKING ENGAGEMENTS

- "The Top Emerging Trends in 2015 Asbestos Litigation." Perrin Conferences Cutting-Edge Issues in Asbestos Litigation Conference, March 15–17, 2015.

- "Asbestos Bankruptcy: A Discussion of the Top Trends in Today's Chapter 11 Cases." Perrin Conferences Asbestos Litigation Conference: A National Overview & Outlook, Sept. 8–10, 2014.

- "An Asbestos Defendant's Legal Liability—The Experience in Garlock's Bankruptcy Asbestos Estimation Trial." Bates White webinar, July 29, 2014.

- "Concussion Suits against the NFL, NCAA, and Uniform Equipment Manufacturers." Perrin Conferences' Legal Webinar Series, May 24, 2012.

- "An Update on US Mass Tort Claims." Perrin Conferences' Emerging Risks on Dual Frontiers: Perspectives on Potential Liabilities in the New Decade, April 12–13, 2012, London, United Kingdom.

- "The Next Chapter of Asbestos Bankruptcy: New Filings, Confirmations, & Estimations." Perrin Conferences' Asbestos Litigation Conference: A National Overview & Outlook, September 13–15, 2010, San Francisco, CA.

- "Trust Online: The Impact of Asbestos Bankruptcies on the Tort System." Perrin Conferences' Asbestos Bankruptcy Conference: Featuring a Judicial Roundtable on Asbestos Compensation, June 21, 2010, Chicago, IL.

- "Current Litigation Trends that are Impacting Asbestos Plaintiffs, Defendants, & Insurers." Perrin Conferences' Asbestos Litigation Mega Conference, September 14–16, 2009, San Francisco, CA.

- "Verdicts, Settlements, and the Future of Values: Where Are We Heading? A Roundtable Discussion." HB Litigation Conferences' Emerging Trends in Asbestos Litigation, March 9–11, 2009, Los Angeles, CA.

- "Role of Bankruptcy Trusts in Civil Asbestos." Mealey's Emerging Trends in Asbestos Litigation Conference, March 3–5, 2008, Los Angeles, CA.

- "The Intersection between Traditional Litigation & the New Bankruptcy Trusts." Mealey's Asbestos Bankruptcy Conference, June 7–8, 2007, Chicago, IL.

- ABA's Insurance Coverage Litigation Committee Conference, March 1–4, 2007, Tucson, AZ.

- Mealey's Asbestos Conference: The New Face of Asbestos Litigation, February 8–9, 2007, Washington, DC.

- Mealey's Asbestos Bankruptcy Conference, December 4–5, 2006, Philadelphia, PA.

- "Seeking Solutions to European Asbestos Claiming: Will it be FAIR?" Keynote address, Mealey's International Asbestos Conference, November 1–2, 2006, London, United Kingdom.

- Mealey's Asbestos Bankruptcy Conference, June 9, 2006, Chicago, IL.

- Harris Martin Publishing Asbestos Litigation Conference, March 2, 2006, Washington, DC.

- Mealey's Wall Street Forum: Asbestos Conference, February 8, 2006, New York, NY.

- Mealey's Asbestos Legislation Teleconference, February 7, 2006.

## PROFESSIONAL ASSOCIATIONS

- National Association of Business Economists

- American Economic Association

- Econometric Society