# EXHIBIT G

# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

IN RE:

BESTWALL LLC,[1]

        Debtor.

Case No. 17-BK-31795 (LTB)

Chapter 11

## REPLY IN SUPPORT OF DEBTOR'S MOTION FOR BANKRUPTCY RULE 2004 EXAMINATION OF ASBESTOS TRUSTS

Bestwall LLC ("Bestwall" or the "Debtor"), the debtor and debtor in possession in the above-captioned chapter 11 case, submits this Reply to the objections of DCPF and Manville Trust[2] (Dkt. 1321), the ACC (Dkt. 1327), and the FCR (Dkt. 1328) (together, the "Objections") to the Motion to obtain limited data under Bankruptcy Rule 2004 concerning Trust filings by the approximately 15,000 Bestwall Claimants whose mesothelioma claims were resolved before the commencement of this case.[3]

## INTRODUCTION

The Objections demonstrate once again the need for the requested Trust discovery to advance this case to resolution. The very objections the ACC and the FCR have filed continue to urge the Court to accept Bestwall's historical settlements as the only fair measure of its liability or what it should pay to resolve this case.[4] The 524(g) Alternative in the ACC/FCR Plan

---

[1] The last four digits of the Debtor's taxpayer identification number are 5815. The Debtor's address is 133 Peachtree Street, N.E., Atlanta, Georgia 30303.

[2] Capitalized terms not otherwise defined herein have the meanings given to them in the Debtor's Motion for Bankruptcy Rule 2004 Examination of Asbestos Trusts (Dkt. 1237) (the "Motion").

[3] Since filing the Motion, the Debtor has continued to confer with counsel for the Trusts, the ACC and FCR in an attempt to narrow the issues in dispute. To date, the Debtor has agreed to revise paragraph 7(d) of the Proposed Order to respond to concerns that have been raised (see Haggerty Decl. ¶3, Dkt. 1324). The Debtor remains committed to discussing the parties' remaining disputes and attempting to resolve them, and will tender to the Court a revised form of the Proposed Order reflecting the parties' agreements at the hearing on this Motion.

[4] See, e.g., ACC Obj. ¶ 22 ("[T]he Debtor's historical settlement values already reflect its assessment of the likelihood that other parties were responsible for any given claimant's injury . . . ."; FCR Obj. ¶ 30 ("The fact that

allegedly uses the same theory in its formulation of settlement offers that mesothelioma claimants would receive. In contrast, the ACC and the FCR barely mention that Bestwall's amended plan proposes a *$1 billion* trust to resolve current and future asbestos claims. They dismiss this substantial offer as intended only "to give the appearance of attempting to move this case forward." ACC Obj. ¶ 1.[5]

The ACC and the FCR take these positions despite barely challenging (and even then only on specious grounds) the serious evidence of misconduct in historical cases presented in Bestwall's Motion. These cases include one of Bestwall's most significant verdicts from 2015 in which the plaintiff and his counsel claimed his exposure to GP joint compound was his only exposure, despite having already cast a ballot attesting to that claimant's exposure to asbestos from Bondex joint compound, then casting a ballot in the Garlock bankruptcy case attesting to exposure to asbestos from gaskets and packing just two months later. Despite their reliance on historical settlements, the ACC and the FCR seek to preclude any discovery that could determine whether those settlements were tainted by evidence suppression and whether the ACC/FCR Plan properly uses those settlements to set the amount of offers that will be extended to mesothelioma claimants or for other purposes in this case.

The privacy concerns raised by DCPF and the Manville Trust (together, the "Trusts") relate to only a narrow part of the data Bestwall has requested, and Bestwall has proposed ways to address those concerns without rendering the data unusable for the purpose for which it is

---

claimants may have filed claims against other asbestos trusts . . . does not reduce or eliminate the Debtor's liability.").

[5] Bestwall's $1 billion proposal to resolve this case belies the ACC's accusations that Bestwall's motives are to delay this case as long as possible to harm its litigation adversaries and "starve the victims into a lower settlement." ACC Obj. ¶¶ 5-6.

sought. The severe restrictions the Trusts seek in their objection, however, would make the

discovery useless and are unwarranted given the robust privacy protections that will be followed.

The Court should allow the requested Trust discovery under Bankruptcy Rule 2004 to

provide the parties vital information about whether Bestwall was subject to practices of evidence

manipulation in its historical mesothelioma cases. In answering this important question, the

requested Trust discovery will remove a major obstacle to resolving this case.

## I.     BESTWALL'S REQUESTED DISCOVERY IS RELEVANT AND NECESSARY

1.      The ACC's and the FCR's continued insistence that Bestwall's historical

settlements are the only proper basis to measure its asbestos liabilities make the requested Trust

discovery relevant and necessary. See, e.g., ACC Obj. ¶ 22; FCR Obj. ¶ 30. The only arguments

the ACC and the FCR raise to the contrary provide no basis for denying this discovery.

### A.     Information about the Bestwall Claimants' other exposures is relevant to testing the ACC's and the FCR's theories about Bestwall's historical settlements.

2.      The ACC argues that "Bestwall's claims exposure does not depend on whether

another defendant also exposed the claimant to asbestos." ACC Obj. ¶ 20. The FCR makes

similar assertions. FCR Obj. ¶¶ 14-23, 30. It is undisputed, however, that state law governs the

validity and amount of claims in bankruptcy, Raleigh v. Ill. Dep't of Revenue, 530 U.S. 15, 20

(2000). A claimant's other asbestos exposures, thus, are critical to determining the extent of

Bestwall's liability for at least two reasons.

3.      *First*, alternative asbestos exposures may demonstrate that Old GP's products did

not substantially contribute to a claimant's mesothelioma. See Thompson v. Better-Bilt Alum.

Prods. Co., 832 P.2d 203, 207 n.6 (Ariz. 1992) (part of substantial causation inquiry involves

examining "the number of other factors which contribute in producing the harm and the extent of

the effect which they have in producing it"); <u>Rutherford v. Owens-Illinois, Inc.</u>, 941 P.2d 1203, 1218 (Cal. 1997) (substantial causation analysis must consider "any other potential causes to which the disease could be attributed (e.g., other asbestos products, cigarette smoking)").

4.      *Second*, as the ACC seems to at least implicitly acknowledge, other asbestos exposures impact Bestwall's share of any potential judgment. <u>See</u> ACC Obj. ¶ 21. Depending on applicable state law, other responsible parties can be allocated shares of liability. <u>See, e.g.</u>, Tex. Civ. Prac. & Rem. Code Ann. § 33.013 (providing for reduction of judgment by liability shares attributed to others); N.Y. Gen. Oblig. Law § 15-108(a) (providing for reduction of judgment by the greater of liability shares attributed to others or payments by others). The ACC even cites cases where defendants were assigned minimal shares of a judgment based on this general principle. ACC Obj. ¶ 21. For this reason, information about alternative exposures is critical to establishing the amount of settlement as well as court judgments.

5.      The <u>Garlock</u> court recognized the relevance of alternative exposures when it concluded that the best estimate of Garlock's aggregate liability "takes into consideration causation, limited exposure and the contribution of exposures to other products." <u>In re Garlock Sealing Techs. LLC</u>, 504 B.R. 71, 73 (Bankr. W.D.N.C. 2014); <u>see also id.</u> at 95-96 (describing importance of alternative exposures in liability allocation under applicable law). Last month, an Oregon appeals court held similarly in an asbestos case involving a plaintiff lawyer's deliberate withholding of exposure evidence in trust-claim filings. <u>Golik v. CBS Corp.</u>, 306 Or. App. 202, 220-23 (2020) (holding that withheld evidence was material to causation defense that exposures on defendant's premises were "insignificant compared to [plaintiff's] other exposures").

6.      Contrary to the ACC's argument, Bestwall's requested Trust discovery *does not seek* settlement payment information. <u>See</u> Motion ¶ 4. Thus, complaints about the relevance of

that information in cases that did not proceed to judgment are a red herring. ACC Obj. ¶¶ 18-19; see also FCR Obj. ¶ 30. The focus of the requested discovery is evidence of *exposure* to the Trusts' products. That information is clearly relevant to Bestwall's liability.

7.      The ACC and the FCR also wrongly suggest that Trust claim information did not matter to Bestwall or Old GP, or that they did not seek information about alternative exposures in their cases. ACC Obj. ¶ 22; FCR Obj. ¶ 31.[6] A cursory review of the cases described in the Motion shows this is not true and that Old GP and its co-defendants regularly sought information about a claimant's alternative exposures, including to products for which the Trusts are responsible.[7] The same point is evident in the ACC's newly filed analysis of the five cases detailed in Bestwall's Informational Brief—as it shows the defendants' dogged efforts to investigate a claimant's potential exposures.[8]

8.      Nor does the ACC present evidence to support its speculation that Bestwall "and its expert, Bates White, likely have much of [the requested Trust] data from prior asbestos bankruptcy engagements." ACC Obj. ¶ 16. The ACC provides no basis for this statement, and no basis exists as the only publicly available data on this topic are in the Garlock estimation record, and Garlock only received Trust discovery with respect to claims that predated June 2010.[9] The limited Trust data that is already available from Garlock does not justify denying more comprehensive Trust discovery that Bestwall's expert needs for his analysis. Bates Decl. ¶¶ 22-

---

[6] In support of its statement that "Old GP historically chose to settle claims without discovery," the FCR misleadingly cites Bestwall's description of its group settlement agreements in its PIQ Motion. FCR Obj. ¶ 31. Those "settlement agreements" (PIQ Motion ¶ 26), however, are only a subset of Bestwall's historical settlements and were entered into to avoid substantial defense costs. See Bestwall Info. Brief at 42 (Dkt. 12). These agreements did not cover settlements of significant claims or verdicts where evidence concealment would matter.

[7] Motion at Ex. 9 (defendants' discovery requests seeking all of Dahlgren Case 1's asbestos exposures, including to nonparties' product (which would include bankrupt companies)); Motion at Ex. 32 (same for Plaintiff B); Motion at Ex. 24 (co-defendant's discovery requests seeking all of Plaintiff A's asbestos exposures to nonparties' products).

[8] See generally ACC Informational Brief at 88-110 (Dkt. 1318).

[9] Bestwall Info. Brief at 35 (Dkt. 12).

23; see also In re Millennium Lab Holdings II, LLC, 562 B.R. 614, 627–28 (Bankr. D. Del. 2016) (allowing Rule 2004 examination of third parties and noting that "[t]he fact that the Trustee already has access to certain documents and information of the Debtors does not detract from the Trustee's testimony that the documents already in his purview are not sufficient to determine the scope of the Trustee's viable claims.").

9.    Furthermore, contrary to the FCR's statement that Bestwall's amended plan "has already been formulated," FCR Obj. ¶ 11, there are important gaps in that plan that the Trust and PIQ discovery are needed to fill—namely, the amounts claimants would be offered under the TDP. The Trust discovery in particular is needed to show that these values need not be equal to Bestwall's historical settlements to be a fair and equitable resolution of this case, to the extent those settlements were tainted by failure to disclose material exposure evidence.

10.    More broadly, the Trust discovery in combination with the PIQ discovery will give the parties, the Court, and voting claimants necessary information to evaluate the parties' competing plans. The information could show that, given the number of expected claims and their characteristics, a $1 billion trust would fund fair and equitable payments to Bestwall claimants that are superior to the likely outcomes under the ACC/FCR Plan.

**B.    Evidence of significant misconduct in the tort system makes Bestwall's requested Trust discovery relevant.**

11.    Bestwall's Motion described eight historical cases in which it has discovered, based on a limited record, evidence manipulation involving non-disclosure of significant asbestos exposures. Motion ¶¶ 24-34. Three of these cases were the subject of the Dahlgren Article published in 2012 by a plaintiff's expert that claimed to identify "three cases of mesothelioma in which the only known exposure to asbestos was from joint compound." Id. at Ex. 8. The ACC's objection attempts to downplay the apparent fraud perpetrated through the

widespread use of the Dahlgren Article and never seriously contests Bestwall's evidence of non-disclosure in the eight case examples. Yet, the settlements of these types of claims are what the ACC and the FCR contend should be used to measure appropriate payments to claimants in this bankruptcy case. The requested Trust discovery is relevant and necessary to show the extent of the non-disclosure problem and whether Bestwall's historical settlements are a reliable measure of its liabilities.

> i.    *The Dahlgren Article was widely used against Old GP.*

12.    Much like Bestwall's evidence of evidence manipulation, the ACC wants the Court to believe the Dahlgren Article was an isolated and insignificant factor in the resolution of Bestwall's historical cases. ACC Obj. ¶¶ 31-32. The ACC even states that the Dahlgren Article "appears to [have been used against Bestwall in] only one incidence." Id. ¶ 32. Nothing could be further from the truth.

13.    Ever since its publication in 2012, the Dahlgren Article was repeatedly used against Old GP in discovery and trials until Bestwall filed this case in 2017. In addition to being used in Plaintiff A's trial, as described in the Motion, plaintiffs used the article in three out of the other four cases that Old GP took to verdict after the article's publication. (in Baltimore,[10] in Delaware,[11] and in Los Angeles[12]). Further, the Dahlgren Article was cited by plaintiff experts in depositions in many significant cases that Old GP settled before Bestwall's bankruptcy filing,[13]

---

[10] 1/31/17 PM Trial Tr. at 1613-15, 1644-55 (plaintiff expert's testimony) (excerpts attached as **Ex. 1**); 2/14/17 Trial Tr. at 3911 (plaintiff's closing argument) (excerpts attached as **Ex. 2**).

[11] 1/16/14 Trial Tr. at 106-08 (plaintiff expert's testimony) (excerpts attached as **Ex. 3**).

[12] 4/17/15 Depo. of James A. Strauchen, M.D. at 24-26 (excerpts attached as **Ex. 4**).

[13] *See, e.g.*, 11/12/15 Depo. of Perry Gottesfeld at 112-16 (excerpts attached as **Ex. 5**); 7/5/17 Depo. of John Templin, CIH at 147-54 (excerpts attached as **Ex. 6**); 7/6/15 Depo. of Allan Smith, M.D. at 31-32 (excerpts attached as **Ex. 7**); 3/25/15 Depo. of Allan Smith, M.D. at 32-33 (excerpts attached as **Ex. 8**); 3/8/16 Depo. of James Strauchen, M.D. at 72-74 (excerpts attached as **Ex. 9**).

and was regularly included in plaintiff experts' reliance lists and relied upon in their reports.[14]

14.     In the face of the repeated use of the Dahlgren Article, and its false assertions about the ability of joint compound to cause mesothelioma, the ACC's attempt to downplay the article as a sideshow and "rabbit hole" fails. ACC Obj. ¶¶ 27, 31-32.[15]

ii.     *The ACC does not seriously contest Bestwall's evidence of misconduct.*

15.     The ACC's response to Bestwall's description of eight cases involving troubling misconduct and evidence manipulation amounts to nothing. The ACC relies on an inaccurate portrayal of bankruptcy ballots and trust claims and cites to its misleading analysis of five of the cases originally described in Bestwall's Informational Brief.

16.     Unable to challenge the merits of misconduct in the eight cases, the ACC wants the Court to believe that a claimant's ballot and trust filings mean nothing and only indicate that the claimant "might have a claim." ACC Obj. ¶ 31. Judge Whitley rejected these same arguments about ballots in Garlock.[16] The ballots that Bestwall attached as exhibits to the Motion contain similar requirements of exposure to the bankrupt's products.[17] This exposure requirement ensures that only proper asbestos claims are temporarily allowed for voting purposes.

---

[14] See, e.g., 3/26/15 Affidavit of John Maddox, M.D. at 27 (excerpts attached as **Ex. 10**); 1/1/14 Samuel Hammar, M.D. Reliance Documents at 45 (excerpts attached as **Ex. 11**); 6/10/15 Bibliography of John Templin, CIH at 3 (excerpts attached as **Ex. 12**); Reference List of Jacqueline Moline, M.D. at 2 (excerpts attached as **Ex. 13**).

[15] Consistent with its approach in the Motion, Bestwall has redacted identifying information about the plaintiffs and law firms involved in the cases where the Dahlgren Article was used because their identities are not immediately relevant, but denies that the identities of persons who sued Bestwall or their law firms are confidential and reserves all rights to disclose the identities of such claimants publicly should they become relevant in this case.

[16] 1/26/15 Hearing Tr. at 10, In re Garlock Sealing Techs. LLC, No. 10-31607 (Bankr. W.D.N.C.) (excerpts attached as **Ex. 14**) ("[T]he claimants will need to make certifications [in ballots] . . . that they have been diagnosed with an asbestos disease and they've been exposed to the products of [Garlock]. . . . I feel there's a need for certification under penalty of perjury. That's the way it works in bankruptcy, generally."). The Garlock ballots required a certification under penalty of perjury that the voting claimant was exposed to Garlock's products. Motion at Ex. 31.

[17] See, e.g., Motion at Ex. 20 (Pittsburgh Corning, Federal Mogul, U.S. Minerals, Owens Corning, and Fibreboard ballots).

- 8 -

17.     As to trust claims, Judge Hodges already has affirmed that all Trusts require "meaningful and credible" evidence of exposure to the Trust's products. See Garlock, 504 B.R. at 86. Bestwall further refuted the ACC's arguments in its response to the ACC's Informational Brief.[18] The ACC cites no new evidence about the meaning of bankruptcy ballots and trust claims, and its position should be rejected.

18.     The ACC also relies on a recently filed "analysis" of the five cases described in Bestwall's Informational Brief. This analysis, however, presents no new facts about the cases. It also fails to undermine Bestwall's original conclusions that each plaintiff's exposures for the Trust claims and bankruptcy ballots discussed in Bestwall's Informational Brief were not disclosed in their case. Instead, the ACC's response only emphasizes that the conduct of these plaintiffs and their lawyers is not defensible. Bestwall has filed a reply which details the irrelevant issues that the ACC's analysis raises.[19]

19.     In short, the ACC and the FCR present no reason to doubt that misconduct tainted the resolutions of the eight cases described in Bestwall's Motion. Yet, these very resolutions are among the ones that the ACC and the FCR insist should be used to measure Bestwall's liability. A systematic analysis of Trust filings is necessary to test whether such an approach is proper.

**C.     The ACC has no evidence the misconduct ceased post-Garlock—the limited evidence available is all to the contrary.**

20.     The ACC's claim that any evidentiary misconduct in the tort system suddenly ceased after the Garlock decision is based on nothing but speculation and wishful thinking. ACC Obj. ¶ 33-35. It is also extremely unlikely, given that plaintiff lawyers have repeatedly attacked the decision, and plaintiff lawyers who testified in the case affirmed the conduct was their

---

[18] Debtor's Response to ACC Informational Brief at 48-49 (Dkt. 1034).

[19] Debtor's Supplemental Response to Informational Brief of the Official Committee of Asbestos Claimants of Bestwall LLC (Dkt. 1351).

regular practice, including one who claimed it was part of his "duty to these clients," which the court characterized as "seemingly some perverted ethical duty." Garlock, 504 B.R. at 84.

21. And in fact, the limited information available shows that this type of misconduct continued to plague Bestwall in the tort system until its bankruptcy petition and is not "old news," as the ACC claims. ACC Obj. to PIQ Motion ¶ 22. Plaintiff A's case was tried over a year after the Garlock decision, and stands as one of the few unreversed plaintiff verdicts in mesothelioma cases against Old GP. At trial, Plaintiff A and his counsel repeatedly claimed his only asbestos exposure was to GP joint compound, despite having cast a ballot attesting to exposure to Bondex joint compound *eight months earlier*. Then, only two months after trial, Plaintiff A's counsel cast a Garlock ballot attesting to his gasket and packing exposure—this ballot also is evidence that Plaintiff A had other industrial exposures that he never acknowledged at trial. Bestwall Motion ¶¶ 30-31. In sworn discovery responses shortly before trial, Plaintiff A had denied knowledge of asbestos exposures to products made by non-parties, which obviously included bankrupt companies like Bondex and Garlock. Motion at Ex. 24.

22. Just last month, an Oregon appellate court issued a decision detailing a similar pattern of misconduct in the trial of an asbestos claim against a Georgia-Pacific subsidiary. Golik, 306 Or. App. 202. In that case, the plaintiff contended that her husband's brief asbestos exposure at a mill owned by the defendant was a substantial contributing factor in causing his mesothelioma. Id. at 206. The defendant argued at trial that any exposures at the mill were immaterial compared to other asbestos exposures in the long career of the plaintiff's husband. Id. at 207. After a plaintiff's verdict, the defendant sought information about the plaintiff's Trust settlements for purposes of crediting them against the judgment. Id. at 211.

23.     One document produced in this process was an affidavit submitted in support of a Trust claim describing the husband's asbestos exposures in the Merchant Marines. Id. This affidavit had not been disclosed in response to defendant's pretrial discovery requests for all documents related to plaintiff's Trust claims. Id. at 217. In contrast to documents and expert testimony presented at trial that failed to describe any exposures while the husband worked as a "wiper" in the Merchant Marines, the affidavit detailed the husband's "daily" asbestos exposures in this job to pipe insulation and other products. Id. at 221. The trial court found that the plaintiff's local counsel had deliberately withheld this affidavit during discovery and granted defendant's motion for a new trial based on grounds of misconduct and newly discovered evidence. Id. at 204, 218. The appellate court affirmed the trial court's finding of deliberate misconduct and grant of a new trial. Id. at 219, 223.

24.     The Plaintiff A and Golik cases are illustrative of the same pattern of evidence manipulation that Bestwall described in its original Informational Brief and the Motion. They also dispel the ACC's "Five Year Lookback" notion that the Garlock decision somehow rid the tort system of this misconduct. ACC Obj. ¶¶ 33-35. These cases show that this misconduct has continued despite defendants' efforts to seek bankrupt exposure information.

25.     The existing Garlock record cannot resolve the parties' dispute on this issue because it includes only claims against Garlock filed before 2010. Thus, the requested Trust discovery should be allowed to provide a full picture of whether evidence manipulation continued until Bestwall's bankruptcy filing.

**D.     The requested discovery will neither delay the case nor be a distraction.**

26.     The Objections are replete with overblown predictions that Trust discovery will delay the case, perhaps taking "months or years to resolve." ACC Obj. at 4. Not so. The Trust

discovery will be simple and quick, since all the requested information is maintained in database form and can be retrieved and produced using simple electronic searches. See Bates Decl. ¶ 24.

27.     The Objections' inflated forecasts of delay and distraction are belied by the actual experience with Trust discovery in Garlock. There, DCPF produced a similar database of Trust information less than a month after the Court allowed the discovery. See Motion ¶ 40. And the Manville Trust produced data and copies of records for over 100,000 non-mesothelioma claimants a little more than a month after the discovery was authorized, despite a more complicated matching exercise. Id. The ACC and the FCR offer no reason to doubt the same efficiency can be achieved here.

28.     Instead, the ACC cites W.R. Grace, and conflates the timing of the Trust discovery in that case with the entire estimation discovery process to suggest that the Trust discovery resulted in years of delay. ACC Obj. ¶¶ 23-24, 39. In fact, the court ordered both the Celotex and DII Industries Trusts to produce the relevant electronic data (involving over 70,000 claimants) within 14 days of entry of the orders. See Motion at Exs. 51 & 52

29.     The ACC and the FCR also invoke the Motors Liquidation bankruptcy, ACC Obj. ¶¶ 38-39; FCR Obj. ¶ 17. There, the court approved similar Trust discovery under Rule 2004, overruling objections by the asbestos claimants committee and the Trusts and finding the information was clearly relevant. See Motion at Exs. 53 & 54. The ACC and the FCR note immaterial differences in the contexts of Motors Liquidation and this case—but at its core, Judge Gerber's decision supports ordering Trust discovery under Bankruptcy Rule 2004.

30.     The ACC similarly fails to distinguish In re Specialty Products Holding Corporation, in which the court enforced subpoenas requiring the THAN Trust to produce data concerning approximately 2,000 claimants with pending lawsuits against the debtors. The ACC

first attempts to distinguish <u>Specialty Products</u> by repeating its already-rejected argument that
this case does not represent a legitimate reorganization effort. <u>See</u> ACC Obj. ¶ 40.[20] The ACC
then characterizes the trust discovery in <u>Specialty Products</u> as "quite wasteful" because
estimation ultimately resulted in a liability amount higher than that proposed by debtors. But the
result of the estimation has no bearing on whether the Trust discovery was necessary and
appropriate. <u>Specialty Products</u> held that it was.

31.    Nor is the requested Trust discovery a "distraction" that "will serve only to
frustrate the prompt resolution of this chapter 11 case." <u>See</u> FCR Obj. ¶¶ 38-39. Instead, the
information is necessary to resolve a key dispute about whether Bestwall's historical settlements
and verdicts were tainted by evidence manipulation and therefore cannot serve as a reliable
measure of liability even if settlements otherwise could. Notwithstanding the FCR's empty
threats of protracted litigation about privilege issues, the discovery will remove a significant
stumbling block in resolving this case.[21]

## II.    BESTWALL'S MOTION IS PROPERLY BROUGHT UNDER RULE 2004

### A.    The "pending proceeding" rule does not bar the Trust discovery.

32.    As a case cited by the ACC and the FCR explains, "[b]ecause Rule 2004(a)
provides that the court may order the examination of any entity, its plain meaning grants to
bankruptcy courts complete discretion in determining whether a Rule 2004 examination is
appropriate." <u>In re Ramadan</u>, No. 11-02734-8-SWH, 2012 WL 1230272, at *2 (Bankr. E.D.N.C.
Apr. 12, 2012). Contrary to arguments in the Objections, the "pending proceedings" rule is not

---

[20] <u>See</u> *Memorandum Opinion and Order Denying the Official Committee of Asbestos Claimants' Motion for
Dismissal, Or Alternatively, Venue Transfer* at 5 (Dkt. 891).

[21] The relevance and necessity of the requested Trust discovery, coupled with its limited scope and protections for
claimants' privacy interests, *see infra* Section III, more than satisfies any "good cause" standard that the FCR and
Trusts argue applies. FCR Obj. ¶¶ 33-40; Trusts Obj. ¶ 39. Tellingly, the ACC does not discuss this standard.

applicable and therefore does not foreclose discovery under Rule 2004. Even if the rule was

potentially applicable, Rule 9014 expressly gives the Court discretion to alter the scope of

discovery for contested matters. Here, the Court should exercise its broad discretion and grant

the Motion, which falls squarely within the scope of Rule 2004.

33.     The Objections argue that (i) estimation of Debtor's asbestos liabilities and (ii)

approval of the ACC/FCR Plan and its Disclosure Statement both warrant application of the

pending proceeding rule. ACC Obj. ¶ 9; FCR Obj. ¶¶ 6-13. But, the estimation motion has not

yet been granted,[22] which only then would initiate a contested matter to which this discovery

could relate.[23] And Bestwall is opposing the ACC/FCR Plan as patently unconfirmable on its

face, so it is not yet apparent that discovery will be necessary in that contested matter. Thus,

there is no pending proceeding that would foreclose discovery under Rule 2004 in this case.

34.     More generally, the purpose of the pending proceeding rule would not be served

by precluding discovery here. When properly applied, the rule prevents Rule 2004 examinations

that "circumvent the safeguards and protections of the Federal Rules of Civil Procedure." In re

Wash. Mut., Inc., 408 B.R. 45, 51 (Bankr. D. Del. 2009); In re Enron Corp., 281 B.R. 836, 841

(Bankr. S.D.N.Y. 2002). In Enron, for example, the court cited the pending proceeding rule in

---

[22] The ACC suggests that the Court made a "preliminary ruling" against estimation. ACC Obj. ¶ 3. Bestwall believes this mischaracterizes the remarks of the Court and the current status of proceedings.

[23] Much has changed in this case since Bestwall's original plan to seek Trust discovery after an estimation proceeding was authorized (namely, competing plans being filed) and the Motion is not premised on an estimation proceeding, contrary to the FCR's suggestion. FCR Obj. ¶¶ 7-9, 30. The Trust discovery, however, will provide information relevant to any contested estimation the Court may order. That is unsurprising because the discovery is necessary to test the ACC's and the FCR's fundamental methodology for valuing Bestwall's asbestos liabilities, which is central to many aspects of the case. Unlike cases that have applied the pending proceeding rule to deny Rule 2004 discovery, the Trust discovery is not an "end run" around the Federal Rules of Civil Procedure. In fact, the same discovery would be equally proper for a contested estimation, plan confirmation, or numerous other contested matters if the Court prefers that procedural pathway. See, e.g., Motion at Ex. 51 (W.R. Grace order compelling production of Trust data subpoenaed in connection with contested estimation); Motion at Ex. 49 (Garlock order granting leave to subpoena Trust data during discovery related to plan confirmation and estimation of non-mesothelioma claims).

denying Rule 2004 discovery because the true motivation of the party seeking it was to obtain

discovery for use in a pending securities fraud class action (in which discovery was stayed) and

there was no "nexus" between the discovery sought and the moving party's interests in the

bankruptcy case. 281 B.R. at 841-42.

35.     That reasoning is inapplicable here, since the Trust discovery is broadly relevant to

many issues in the bankruptcy case, beyond any particular contested matter. Indeed, the

discovery is necessary to test the ACC's and the FCR's fundamental valuation position that

Bestwall's liability is properly measured by its settlement history—an issue that is central to the

disputes separating the parties and preventing them from resolving this case. Thus, it touches

every matter, from their rejection of a $1 billion plan, to their attempted use of settlements to

determine matrix offers in their plan, to their general position regarding plan funding. Indeed,

despite the Debtor's billion-dollar offer, the ACC claims "the Debtor cannot—or simply will

not—engage in a meaningful negotiation and plan process." ACC Obj. ¶ 28. The Court cannot

assess whether this is true without the requested discovery. For that reason <u>Enron</u> and other cases

applying the pending proceeding rule to bar Rule 2004 discovery sought primarily for reasons

unrelated to the bankruptcy case are inapposite. <u>See, e.g.</u>, <u>In re Cambridge Analytica LLC</u>, 600

B.R. 750, 752 (Bank. S.D.N.Y. 2019); <u>Ramadan</u>, 2012 WL 1230272, at *3. Tellingly, the ACC

and the FCR cite no case applying the pending proceeding rule when the requested Rule 2004

discovery was relevant to issues broader than a single contested matter.

36.     By contrast, numerous courts have allowed Rule 2004 discovery despite a pending

contested matter or other litigation. <u>See, e.g.</u>, <u>In re Buick</u>, 174 B.R. 299, 306 (Bankr. D. Colo.

1994) (allowing Rule 2004 examination of "issues in addition to or beyond the scope of the

pending adversary proceeding(s) or regarding related issues"); <u>In re M4 Enters., Inc.</u>, 190 B.R.

471, 476 (Bankr. N.D. Ga. 1995) (allowing Rule 2004 examination despite pending contested matter because topic was relevant to broader issues); In re Int'l Fibercom, Inc., 283 B.R. 290, 293 (Bankr. D. Ariz. 2002) (holding that company was entitled to Rule 2004 examination notwithstanding pending state court litigation between the parties). Bankruptcy Rule 9014(c) expressly permits such a result, noting that the Federal Rules of Civil Procedure apply to contested matters "unless the court directs otherwise." See M4 Enters., 190 B.R. at 475.

37.     Ultimately, "[a]pplying the pending proceeding rule is discretionary and not mandatory." In re Camferdam, 597 B.R. 170, 174 (Bankr. N.D. Fla. 2018). In determining whether to apply the rule to foreclose Rule 2004 discovery, the "difficult and relevant question" is whether the "primary purpose [of the discovery] is to further the administration of the bankruptcy case." Ramadan, 2012 WL 1230272, at *3. Here, the primary purpose of the discovery is to test the reliability of Bestwall's settlement history, which is central to numerous aspects of the administration of this bankruptcy case.[24] Therefore, in the words of a decision cited by the FCR, broad discovery under Rule 2004 is warranted "regardless of whether [the discovery] may also be at issue" in pending litigation. Camferdam, 597 B.R. at 174.

**B.     This bankruptcy case is the proper forum for discovery.**

38.     The tort system is not the proper forum for the Trust discovery, as the ACC and the

---

[24] The FCR cites the Specialty Products and Garlock cases as examples where courts denied similar Rule 2004 requests for Trust information. FCR Obj. ¶¶ 18-19. Specialty Products is inapposite because the Court based its ruling on its view that the debtor's historical settlement levels should be the focus of any estimation methodology. 7/25/11 Hearing Tr. at 46-47, 70, In re Specialty Prods. Holding Corp., No. 10-11780 (Bankr. D. Del.) (Dkt. 1504) (excerpts attached as **Ex. 15**) ("I think you need to rely on the debtor's past history and the debtor's analysis of its current claims and what its liability will be as a start."). The Court has not adopted such a view here. The FCR also mischaracterizes the Garlock proceedings. He cites the Garlock court's bench ruling on a motion to compel 30(b)(6) depositions of certain Trusts about the burdens of complying with Rule 2004 Trust discovery requests and falsely suggests that this ruling was on the merits of the Rule 2004 discovery. In fact, the debtor's Rule 2004 motion for Trust discovery was never decided by the Court and the debtor later re-filed a request to subpoena the Trust discovery, which Judge Hodges authorized. See *Motion of Debtors for Leave to Serve Subpoena on Delaware Claims Processing Facility, LLC* at n.6, Garlock (Dkt. 2143) (excerpts attached as **Ex. 16**); Motion at Ex. 4.

FCR contend. See ACC Obj. ¶¶ 8, 26; FCR Obj. ¶ 37. In fact, Bestwall could not obtain the

requested data "in the tort system" because Old GP already settled these cases or resolved them

by verdict.[25] For this reason, there is no pending litigation in these resolved cases in which

Bestwall could conceivably take discovery, especially not in the systematic and efficient way

that the Motion proposes. And in any event, the requested Trust data is relevant in this

bankruptcy case because the ACC and the FCR are relying on historical settlements to measure

Bestwall's asbestos liability and what it should pay current and future claimants.

## III.   BESTWALL'S PROPOSED ORDER ADEQUATELY PROTECTS CLAIMANTS' PRIVACY CONCERNS

39.     Only three of the eighteen fields Bestwall seeks from the Trusts involve

information that can legitimately be described as sensitive personal information—the Injured

Party SSN; the date of birth of the Injured Party; and SSN of any claimant who is not the Injured

Party. The remaining fields contain information routinely required to be disclosed publicly by

tort claimants who pursue claims in state and federal courts. See, e.g., *Complaint*, Lineberger v.

CBS Corp., No. 16-cv-390 (W.D.N.C.) (attached as **Ex. 17**).

40.     Contrary to the Trusts' repeated assertions, the data Bestwall seeks is not similar to

the data Garlock requested from the Manville Trust. That request was much broader and, as

Judge Whitley observed, covered substantial "inherently sensitive" personal information, which

included "personal identifiers, medical information, medical records, potentially financial and

economic information about them and their families . . . ."[26] With the exception of three personal

identifiers identified above that are necessary to match the Trusts' data with Bestwall's, Bestwall

seeks none of the types of information Judge Whitley recognized as "inherently sensitive".

---

[25] Bestwall's Motion thus infringes no claimant's jury trial right, as the ACC suggests. ACC Obj. ¶ 26.
[26] 6/30/15 Hearing Tr. at 6-7, Garlock (excerpts attached as **Ex. 18**).

41.     Nevertheless, the Proposed Order would treat all data provided by the Trusts as inherently sensitive.  It incorporates all of the protections Judge Hodges ordered when he approved Garlock's request for data from the DCPF Trusts[27] and adds protections Judge Whitley ordered when he approved Garlock's request for information from the Manville Trust, including:

- A prohibition against dissemination or disclosure of the Matched Production, and Merged Database[28] (and any excepts or data therefrom) to any person other than the Debtor, the ACC, the FCR, New GP, their lawyers, retained experts and the employees of such persons who are personally performing work with respect to this bankruptcy case;

- The requirement that each entity or person exercising a right of access:
    - consent to the exclusive jurisdiction and venue of the Court for any dispute pertaining to the interpretation or enforcement of the Order;
    - execute a written joinder agreeing to be bound by the Order; and
    - provide for physical, managerial, and electronic security such that the Matched Production data are secure and safe from unauthorized access or use during utilization, transmission, and storage;

- A prohibition against (i) offering claimant-specific data from or derived from the Matched Production as evidence in the bankruptcy case, (ii) placing it on the public record, or (iii) filing it with the Court, the District Court, or any reviewing court, absent further Court order after a 30-day notice of hearing of a motion authorizing such use (with notice to claimants provided to their attorneys at the addresses contained in the data produced by the Trusts);

- A restriction on using the Matched Production only in connection with this case; and

- A requirement that any person or entity possessing the Matched Production, any Merged Database or any excerpts therefrom provide written confirmation within one year of substantial plan consummation they have permanently deleted those files.

42.     In sum, Bestwall has narrowly tailored the scope of its request to include non-sensitive information about Trust claims and exposure to asbestos-containing products for which the Trusts are responsible. Bestwall has also adopted provisions this Court previously found would adequately protect the Trusts' claims data from improper disclosure and misuse. These

---

[27] Motion at Ex. 4.

[28] These capitalized terms are defined in the Proposed Order on the Motion. See Motion at Ex. 1.

measures ensure that the Trust data will stay confidential and be used only for legitimate

purposes in this case.

43.     The Trusts cite an article published by the Madison-St. Clair Record disclosing the

amount of settlements obtained by some <u>Garlock</u> mesothelioma claimants as proof that

"confidentiality restrictions and sealing requirements intended to protect claimants' privacy can

(and will) be circumvented." Trusts Obj. ¶ 58. Garlock properly introduced the evidence in its

bankruptcy case under seal. In response to numerous requests for public access to court records,

the Court later determined that much of the information was not sensitive under federal law and

therefore had to be released to the public.[29] This was not a failure of the Court's protective

orders. In any event, the Proposed Order requires pre-clearance by the Court before any party

can use trust data in the case.

44.     The Trusts' argument that compliance with Bestwall's request will impair

claimants' faith in the Trust system is unfounded. Trusts Obj. ¶¶ 78-81. The Trusts' distribution

procedures clearly provide that the Trusts must disclose the contents of trust submissions to third

parties in response to valid subpoenas.[30] Moreover, although many courts have required the

production of trust submissions and their contents in individual and mass tort cases, <u>see, e.g.</u>,

Motion ¶¶ 21-23, the Trusts present no evidence these orders have chilled trust filings or

undermined any trusts.

---

[29] *Order on Motions to Seal Materials in Record of Estimation Proceeding and Protocol for Redaction of Record* ¶ 2, <u>Garlock</u> (Dkt. 4195) (attached as **Ex. 19**).

[30] <u>See, e.g.</u>, Owens Corning/Fibreboard Asbestos Personal Injury Trust Distribution Procedures § 6.5, available at http://www.ocfbasbestostrust.com/wp-content/uploads/2015/12/OC-FB.-Amended-TDP.12.2.2015-C0463534x9DB18.pdf (last accessed Sept. 8, 2020).

## IV.    THE COURT SHOULD DENY THE OBJECTORS' ATTEMPTS TO RESTRICT BESTWALL'S ACCESS TO AND USE OF THE REQUESTED TRUST DATA.

45.    The Trusts seek a number of restrictions on Bestwall's access to and use of the requested Trust information, many of which they unsuccessfully sought in <u>Garlock</u>. Bestwall's lawyers engaged in a series of conferences with the Trusts' counsel to discuss and resolve the Trusts' specific concerns. Although Bestwall and the Trusts reached agreement on only one issue, Bestwall will continue discussions in an effort to resolve all of the Trusts' concerns. If not resolved, however, the Trusts' demands would place unreasonable restrictions on Bestwall, the parties and the Court.

### A.    The Trusts' demand for "pre-production anonymization" of any produced data would frustrate Bestwall's use of the data.

46.    The Trusts propose that all personal identifying information be removed before production to Bestwall. Trusts Obj. ¶¶ 64-68. Under this proposal, Bestwall would hire an independent expert agreeable to the Trusts to merge the Trusts' data fields with Bestwall's list of settled mesothelioma claimants. That expert would then anonymize the matched database and produce it to Bestwall. Without the identity of claimants, however, Bestwall and its claims experts could not analyze the data on a claim-by-claim basis to determine whether claimants' failure to produce evidence of Trust exposures affected resolutions of Old GP's mesothelioma claims. This would make it impossible to evaluate the very issue that the information is sought to address. Pre-production anonymization would defeat a critical purpose of the discovery.

47.    In <u>Garlock</u>, Judge Hodges rejected a very similar anonymization request from many of the DCPF Trusts in response to requested discovery.[31] The claim-by-claim matching

---

[31] <u>See</u> Motion at 4 (¶ 7); <u>see also</u> *DCPF Trusts' Emergency Application to Impose Reasonable Privacy Protections on Trusts' Responses to Debtors' Subpoena Duces Tecum for Information Regarding Settled Claims, and to Require Debtors to Cover the Full Costs and Expenses of Complying with Debtors' Subpoena* ¶¶ 34-36, <u>Garlock</u> (Dkt. 2366) (excerpts attached as **Ex. 20**).

that the produced Trust data allowed was critical to Garlock's discovery of pervasive evidence suppression.

48.     As a fallback, the Trusts argue the Court should follow the *post-production* anonymity process adopted by Judge Whitley in Garlock (the "Garlock Anonymization Protocol"). Trusts Obj. ¶¶ 69-73; Motion at Ex. 49. The ACC makes this same request. ACC Obj. ¶¶ 43-44. Judge Whitley ordered the Manville Trust to produce data to Garlock's claims experts, Bates White, to permit them to match the data with the claimants who filed a proofs of claim and then to "anonymize" the matched data by removing personal identifying information for each record and replacing it with a "unique identifier." The result was an anonymized version of the Matched Production. The Trusts and ACC both fail to mention that Judge Whitley also ordered Bates White to create and separately store a "Matching Key" that retained the personal identifying information for each unique qualifier. Motion at Ex. 49 (¶ 7). Judge Whitley ordered Bates White to secure the Matching Key in a separate, password-protected folder. Id. ¶7(e). Recognizing the need to analyze data on a case-by-case basis, Judge Whitley permitted Bates White to use the Matching Key, among other things, to match and combine data in the Anonymized Matched Production for individual claims with data from the Debtor's database and other sources so long as the extracted data did not include claimant identifying information. Id.

49.     Bestwall did not include the Garlock Anonymization Protocol in the Proposed Order because Bestwall does not request medical, financial and family information and the other types of sensitive data requested by Garlock. The Trusts suggest Bestwall is disingenuous for not mentioning this protocol and offering to adopt it. During the meet-and-confer process, however, the Trusts insisted on pre-production anonymization and, when Bestwall's counsel asked

whether the Trusts would agree to the Garlock Anonymization Protocol, the Trusts' counsel said

they would not.

### B. Bestwall's request for Trust data is narrowly tailored to obtain necessary information without imposing undue burdens on the Trusts.

50.     The Trusts insist Bestwall should accept a sample of the requested Trust data,

Trusts Obj. ¶¶ 59-63, but Bestwall has already limited its request to a sample by seeking data for

the Bestwall Claimants from only 11 of the 71 operating asbestos trusts. Further, sampling serves

no purpose because sampling is not necessary to streamline discovery; obtaining data on all the

Bestwall Claimants here is no more burdensome than doing so for only 1,500 as the Trusts

propose. Bates Decl. ¶ 24. Sampling is also unwise because it would preclude Bestwall from

obtaining highly relevant evidence, undercut the probative value of any information that is

produced, and introduce an avoidable set of potential disputes regarding analytical errors and the

representativeness of the sample. Finally, the <u>Garlock</u> court rejected an identical argument from

the Manville Trust about sampling with regard to a data request for over 100,000 claimants.[32]

51.     The Trusts also contend that many of the data fields in Bestwall's request are

irrelevant to Bestwall's proposed uses for the data. Trusts Obj. ¶ 74. The Court rejected a similar

argument by the Manville Trust in <u>Garlock</u>, where the debtor sought far broader information

from that Trust than Bestwall seeks here.[33] In fact, the <u>Garlock</u> court expressly ordered Bates

White to use many of the fields that the Trusts object to here (date of death, state of residency,

gender, and law firm) for identification purposes and to ensure claimants were not included in

the matched production that did not have claims against Garlock. Motion at Ex. 49 (¶ 6).

Bestwall requests these fields and others for the same identification purposes in this case. Motion

---

[32] Motion at Ex. 49; *Objection of Non-Party Manville Personal Injury Settlement Trust to the Debtors' Motion for Leave to Serve Subpoena* ¶¶ 47-51, <u>Garlock</u> (Dkt. 4638) (attached as **Ex. 21**) (the "*Manville Objection*") .
[33] Motion at Ex. 49 (¶ 6); *Manville Objection* ¶ 40 (Ex. 21).

¶ 4 & n.7. The Trusts also contest the relevance of the request for the status and mode of review

for each Trust claim. Trusts Obj. ¶ 74. These data fields, like all of the requested fields, will

provide crucial information to test the ACC's and the FCR's theories about Bestwall's historical

settlements reflecting its true legal liability. See Bates Decl. ¶¶ 22-23. The particular fields at

issue will provide the dates when Bestwall Claimants filed or were paid on their Trust claims.

Without these dates, the probative value of any party's analysis will be undermined because it

would be impossible to determine if a Bestwall Claimant had made inconsistent exposure

allegations to Trusts before or during the litigation of their claims in the tort system.

### C. Bestwall's matching process ensures non-Bestwall claimants will be excluded from the Matched Production.

52.     The Proposed Order would require the Trusts to identify claimants in their

databases whose filings match (a) any Bestwall Claimant's nine-digit SSN, or (b) any Bestwall

Claimant's last name and last four digits of SSN (the "Matching Claimants"). The Trusts would

not produce any data until they notify the Matching Claimants' counsel of record of Bestwall's

request and that the Matching Claimants' data will be produced if they do not notify the Trusts

and Bestwall that the Matching Claimant is not a Bestwall Claimant. This provides assurance the

Matched Production will not include data for non-Bestwall Claimants.

53.     In the unlikely event some non-Bestwall Claimants are not identified and are

included in the Matched Production, Bates White will be able to identify such claimants through

use of other data fields in the Matched Production, such as date of birth; date of diagnosis; state

of residency; claimant's law firm; and date of tort filing. Bates White will notify the Trusts of

any such non-Bestwall Claimants and permanently delete their data from the Matched

Production. Judge Whitley adopted this procedure in his Manville Trust order in Garlock (which

even used a more rudimentary initial matching process because Garlock did not have SSNs for

many of the underlying claimants). Motion at Ex. 49 (¶¶ 4-7).

54.    The Trusts request that the Matched Production include only those claimants

identified by both full SSN and an additional data field (such as name or date of birth). Trusts

Obj. ¶¶ 76-77. They argue that a claimant could make a mistake inputting his or her full SSN that

inadvertently identifies the wrong Bestwall Claimant. This risk is very low and would be easily

picked up and corrected by the procedures described above. Simple concepts of probability show

that the much more likely outcome is that a SSN transposition error would not identify another

Bestwall Claimant and would instead lead to no match all.[34] Bestwall is willing to bear this risk

to ensure the matching process is as targeted and easy as possible.

55.    While the Trust's proposed procedure does little to protect Non-Bestwall

Claimants, it would create a real "false negative" risk—that is, Bestwall Claimants whose SSNs

are verified through the matching process would be excluded because of a mistake in their names

or dates of birth. The Court should reject the Trusts' proposal because, unlike Bestwall's

procedures to protect against false positive identifications, the Trust offers no mechanism to

identify and correct false negative identifications.

**D.    The Trusts' requested restrictions on access to and use of the Matched
Production are unworkable.**

56.    The Trusts argue that access to their data and any merged dataset containing such

data should be restricted to the retained professionals of Bestwall, the ACC, and the FCR with a

demonstrated "need to know." Trusts Obj. ¶¶ 84-85. Like the Trusts' other proposed restrictions,

however, this would defeat a key purpose of the discovery. It would prohibit Bestwall's

---

[34] This is evident by comparing the over 450 million original SSNs that have been issued against the pool of 15,000
Bestwall Claimants. See https://www.ssa.gov/policy/docs/ssb/v69n2/v69n2p55.html (last accessed Sept. 8, 2020).

professionals from sharing and conferring with Bestwall and its in-house and outside lawyers about Trust data relating to any specific claim. The restriction would hamstring Bestwall in analyzing and offering evidence regarding whether Trust exposure evidence affected the resolution of any particular claim.

57.     The Trusts also object to the Proposed Order's restriction that "the Matched Production shall be used only in connection with this bankruptcy case." Trusts Obj. ¶ 83. They argue that any Trust data should be even further limited for use only in the "negotiation, solicitation, and confirmation of a plan," purposes described in the Motion. Id. This restriction is unreasonably narrow, and could even be construed to prohibit Bates White from using Trust data to estimate Bestwall's liability for mesothelioma claims for purposes of negotiating, soliciting, and confirming of a plan.

## CONCLUSION

58.     For all of these reasons and those discussed in the Motion, this Court should grant the Motion and overrule the objections thereto.

Dated:  September 14, 2020
Charlotte, North Carolina

Respectfully submitted,

/s/ Garland S. Cassada
Garland S. Cassada (NC Bar No. 12352)
Richard C. Worf, Jr. (NC Bar No. 37143)
ROBINSON, BRADSHAW & HINSON, P.A.
101 North Tryon Street, Suite 1900
Charlotte, North Carolina 28246
Telephone: (704) 377-2536
Facsimile: (704) 378-4000
E-mail:    gcassada@robinsonbradshaw.com
           rworf@robinsonbradshaw.com

Gregory M. Gordon (TX Bar No. 08435300)
JONES DAY
2727 North Harwood Street, Suite 500
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
E-mail:    gmgordon@jonesday.com
(Admitted *pro hac vice*)

Jeffrey B. Ellman (GA Bar No. 141828)
JONES DAY
1420 Peachtree Street, N.E., Suite 800
Atlanta, Georgia 30309
Telephone: (404) 581-3939
Facsimile: (404) 581-8330
E-mail:    jbellman@jonesday.com
(Admitted *pro hac vice*)

Cary Ira Schachter (TX 17719900)
Raymond P. Harris, Jr. (TX 09088050)
Erin A. Therrian (TX 24072524)
SCHACHTER HARRIS, LLP
909 Lake Carolyn Parkway, Suite 1775
Irving, Texas 75039
Telephone: (214) 999-5700
E-mail:    cschachter@shtriallaw.com
           rharris@shtriallaw.com
           etherrian@shtriallaw.com
(Admitted *pro hac vice*)

ATTORNEYS FOR DEBTOR AND DEBTOR
IN POSSESSION